IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 3, 2011 Session

## JOSEPH EDWARD RICH, M.D. v. TENNESSEE BOARD OF MEDICAL EXAMINERS

Appeal by Permission from the Court of Appeals, Middle Section
Chancery Court for Davidson County
No. 08-229-II     Carol McCoy, Chancellor

No. M2009-00813-SC-R11-CD - Filed October 10, 2011

This is an appeal from an administrative hearing wherein the Tennessee Board of Medical Examiners suspended a physician's medical license for one year and imposed other conditions after finding that, among other things, the physician had violated Tennessee Code Annotated sections 63-6-214(b)(1),(4), and (12) (2010).  Upon review, the trial court affirmed the Board's ruling; however, because the Board failed to articulate the applicable standard of care in its deliberations, the Court of Appeals reversed the Board's ruling.  We agree with the Court of Appeals that the Board was required to articulate the standard of care in its deliberations.  Therefore, we vacate the ruling of the trial court to the extent that it affirms the Board's decision that the physician violated Tennessee Code Annotated sections 63-6-214(b)(1),(4), and (12).  However, rather than reversing the Board's decisions, we are remanding the matter to the Board and instructing it to conduct deliberations based on the existing record and articulate the applicable standard of care as required by the statute.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Chancery Court
Affirmed in Part and Vacated in Part; Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.  JANICE M. HOLDER, J., filed a dissenting opinion.

Robert E. Cooper, Jr., Attorney General and Reporter; Joseph F. Whalen, Associate Solicitor General; and Sara E. Sedgwick, Senior Counsel, for the appellant, Tennessee Board of Medical Examiners.

James C. Bradshaw, Nashville, Tennessee, and Jeffrey B. Levens, Chicago, Illinois, for the appellee, Joseph Edward Rich, M.D.

# OPINION

## Facts and Procedural History

In August 1995, the Tennessee Board of Medical Examiners ("the Board") granted Dr. Joseph Edward Rich, M.D., a conditional license to practice medicine in Tennessee. Dr. Rich opened the Center for Environmental and Integrative Medicine in Knoxville, eventually including in his practice the administration of chelation therapy,[1] intravenous hydrogen peroxide therapy,[2] and the use of methadone to treat patients suffering from opioid dependency.

In June 2005, the Division of Health Related Boards of the Tennessee Department of Health filed a Notice of Charges against Dr. Rich, which were subsequently amended to allege that Dr. Rich had committed acts or omissions constituting grounds for disciplinary action under Tennessee Code Annotated §§ 63-6-214(b)(1), (4), (12) and (14);[3] rules 0880-

---

[1] "Chelation therapy" is defined as "the use of a chelator [binding agent] (as EDTA [ethylenediaminetetraacetic acid]) to bind with a metal (as lead or iron) in the body to form a chelate so that the metal loses its chemical effect (as toxicity or physiological activity). http://merriam-webster.com/dictionary/chelation%20therapy. (last visited Aug. 18, 2011). Donna L. Seger, M.D. testified in this case that chelation therapy involves the intravenous administration of a drug that "kind of grabs the metals, pulls them out of your body - - out of the tissues, and then excretes them into the urine."

[2] "Hydrogen peroxide therapy" is defined as a type of oxygen/ozone therapy in which

> hydrogen peroxide [is] administered via gas or water to kill disease microorganisms, improve cellular function, and promote the healing of damaged tissues. The rationale behind bio-oxidative therapies, as they are sometimes known, is the notion that as long as the body's needs for antioxidants are met, the use of certain oxidative substances will stimulate the movement of oxygen atoms from the bloodstream to the cells. With higher levels of oxygen in the tissues, bacteria and viruses are killed along with defective tissue cells. The healthy cells survive and multiply more rapidly. The result is a stronger immune system. . . . In the 1920's, an American physician named William Koch experimented with hydrogen peroxide as a treatment for cancer. He left the United States after a legal battle with the FDA.

http://medical-dictionary.thefreedictionary.com/Ozone+Therapy. (last visited Aug. 18, 2011).

[3] In pertinent part, Tennessee Code Annotated section 63-6-214(b) authorizes the Board to exercise its disciplinary authority upon the following grounds:

(continued...)

02-.14(6)(c) and (e)(3) of the Official Compilation of the Rules and Regulations of the State of Tennessee;[4] and 21 U.S.C. § 823(g)(1) (2000).[5] During the lengthy hearing that

_____

[3](...continued)

    (1) Unprofessional, dishonorable or unethical conduct;

    . . . .

    (4) Gross malpractice or a pattern of continued or repeated malpractice, ignorance, negligence or incompetence in the course of medical practice;

    . . . .

    (12) Dispensing, prescribing or otherwise distributing any controlled substance or any other drug not in the course of professional practice, or not in good faith to relieve pain and suffering, or not to cure an ailment, physical infirmity or disease, or in amounts and/or for durations not medically necessary, advisable or justified for a diagnosed condition;

    . . . .

    (14) Dispensing, prescribing or otherwise distributing any controlled substance or other drug to any person in violation of any law of the state or of the United States.

[4] Rule 0880-02-.14(6)(c) of the Rules of the Tennessee Board of Medical Examiners provides as follows:

    If a physician provides medical care for persons with intractable pain, with or without the use of opiate medications, to the extent that those patients become the focus of the physician's practice the physician must be prepared to document specialized medical education in pain management sufficient to bring the physician within the current standard of care in that field which shall include education on the causes, different and recommended modalities for treatment, chemical dependency and the psycho/social aspects of severe, chronic intractable pain.

Rule 0880-02-.14(e)(3) further provides as follows:

    Prescribing, ordering, administering, or dispensing dangerous drugs or controlled substances for pain will be considered to be for a legitimate medical purpose if based upon accepted scientific knowledge of the treatment of pain, including intractable pain, not in contravention of applicable state or federal law, and if prescribed, ordered, administered, or

(continued...)

followed, the Department introduced the expert testimony of Donna L. Seger, M.D., who testified as to the standard of care for diagnosing heavy metal toxicity and the affidavit

---

[4](...continued)

dispensed in compliance with the following guidelines where appropriate and as is necessary to meet the individual needs of the patient:

(i) After a documented medical history, which may be provided orally or in writing by the patient, and a physical examination by the physician providing the medication including an assessment and consideration of the pain, physical and psychological function, any history and potential for substance abuse, coexisting diseases and conditions, and the presence of a recognized medical indication for the use of a dangerous drug or controlled substance;

(ii) Pursuant to a written treatment plan tailored for the individual needs of the patient by which treatment progress and success can be evaluated with stated objectives such as pain relief and/or improved physical and psychosocial function. Such a written treatment plan shall consider pertinent medical history and physical examination as well as the need for further testing, consultations, referrals, or use of other treatment modalities;

(iii) The physician should discuss the risks and benefits of the use of controlled substances with the patient or guardian;

(iv) Subject to documented periodic review of the care by the physician at reasonable intervals in view of the individual circumstances of the patient in regard to progress toward reaching treatment objectives which takes into consideration the course of medications prescribed, ordered, administered, or dispensed as well as any new information about the etiology of the pain;

(v) Complete and accurate records of the care provided as set forth in parts (i)-(iv) of this paragraph should be kept. When controlled substances are prescribed, names, quantities prescribed, dosages, and number of authorized refills of the drugs should be recorded, keeping in mind that pain patients with a history of substance abuse or who live in an environment posing a risk for medication misuse or diversion require special consideration. Management of these patients may require closer monitoring by the physician managing the pain and consultation with appropriate health care professionals.

[5] 21 U.S.C. § 823(g)(1) provides in pertinent part as follows:

[P]ractitioners who dispense narcotic drugs to individuals for maintenance treatment or detoxification treatment shall obtain annually a separate registration for that purpose.

testimony of Benjamin Johnson, M.D., describing the standard of care for treating a patient with methadone. The Department also submitted patient records from Dr. Rich's office documenting his diagnosis and treatment of patients with methadone. Dr. Rich testified in his own behalf, but did not present any witnesses. After deliberation, the Board[6] issued its final order setting forth findings of fact that included the following:

• In June 1999, the Board placed Dr. Rich's medical license on two years probation with specified conditions because he failed to maintain the advocacy of another doctor and the Tennessee Medical Foundation in accordance with the conditions of his Tennessee licensure and because he instructed his eighteen-year-old receptionist to fill out pre-signed prescriptions for Phentermine and Fenfluromine for patients while he was on vacation. In May 2002, the Board ratified an agreed order finding that Dr. Rich had violated the conditions of his probation and placed further conditions on his practice.[7]

• Dr. Rich falsely claimed on the Center for Environmental and Integrative Medicine's website that he had been approved for participation in a National Institute of Health study identified as "Trial to Access Chelation Therapy."

• Dr. Rich treated patient "M.H." from August 2003 to March 2004. Lab tests ordered by Dr. Rich dated August 15, 2003, showed that M.H. had a high blood triglyceride level of 232 mg/dL, a high blood glucose level of 147 mg/dL, and blood pressure of 164/88. A diagnostic laboratory report ordered by Dr. Rich dated August 21, 2003, shows that M.H. had

---

[6] The Tennessee Medical Practice Act establishes the Board of Medical Examiners, Tennessee Code Annotated section 63-6-101(a)(1) (2010), and imposes upon it the duty of conducting disciplinary hearings. Tenn. Code Ann. § 63-6-101(a)(3). Upon establishment of specified grounds, Tennessee Code Annotated section 63-6-214(a) authorizes the Board to

> (1) Deny an application for a license to any applicant who applies for the
> same through reciprocity or otherwise;
> (2) Permanently or temporarily withhold issuance of a license;
> (3) Suspend, or limit or restrict a previously issued license for such time
> and in such manner as the board may determine;
> (4) Reprimand or take such action in relation to disciplining an applicant
> or licensee, including, but not limited to, informal settlements, private
> censures and warnings, as the board in its discretion may deem proper; or
> (5) Permanently revoke a license.

[7] By agreed order of September 17, 2002, the Board terminated Dr. Rich's probation of two years with all conditions imposed on his practice to remain in full force.

a post-provocation urine level[8] with six elements beyond the reference range of the report, but acknowledges that "[e]lement reference ranges were developed from a healthy population under non-provoked/non-challenged conditions," that "[p]rovocation with challenge substances is expected to raise the urine level of some elements," and that "[t]his test has not been cleared or approved by the U.S. Food and Drug Administration." Dr. Rich diagnosed M.H. with heavy metal toxicity and treated him on several occasions with both chelation therapy and hydrogen peroxide therapy between September 2003 and March 2004. A diagnostic report dated February 2004 shows that M.H.'s blood triglyceride level had increased to 242 mg/dL and that his blood glucose level had increased to 297 mg/dL. Despite the fact that in August of 2003, M.H. had noted on his initial health history a current medication history that included insulin, oral anti-hyperglycemic medications, an anti-hypertensive agent, and a medication for hyperlipidemia, Dr. Rich did not document that any of these medications were prescribed for M.H. during the time of his treatments, and he "failed to document whether or not he advised M.H. to be treated and/or with or continue treatment with these medications by another physician." Finally, although Dr. Rich stated in an interview with a Department investigator in March of 2003, that he always conducts an electrocardiogram ("EKG") on patients he treats with chelation therapy, at no time during the treatment of M.H. with chelation therapy did he document conducting or interpreting an EKG and there is no copy of an EKG included in the medical record.

• Dr. Rich treated patient "R.H." from January 2001 to February 2004. In January 2001, R.H. indicated a medical history of hypertension, epilepsy, and high cholesterol. In April 2002, a pre-provocation urine analysis ordered by Dr. Rich indicated that none of the elements tested for were beyond the reference range. Despite these normal test results and without documenting that the test was repeated with different results, in May 2002, Dr. Rich diagnosed R.H. with heavy metal toxicity and documented chelation therapy as the treatment plan. Thereafter, from May 30, 2002, to December 2, 2003, he provided R.H. with approximately 49 chelation treatments. In March 2003, a hair analysis indicated the presence of multiple heavy metals beyond the reference range, and a January 2004 hair analysis indicated that the level had increased in approximately fourteen categories. From September 9, 2003, through March 2, 2004, Dr. Rich provided R.H. with approximately six intravenous hydrogen peroxide treatments. On March 2, 2004, although R.H. complained of feeling tired and having pressure in his chest, Dr. Rich failed to document measuring R.H.'s heart and respiration rates. An unconfirmed EKG on the same date indicated an inferior myocardial

---

[8] Dr. Seger testified that "provoked" urine testing entails the administration of drugs (usually the same drug used to chelate) that cause metals to be released through the urine, that anyone given a provoked urine test would show metals in their urine and that "there hasn't been a standard of normal setup [sic] for provoked testing." Dr. Seger testified that the standard for diagnosis of heavy metal toxicity is a non-provoked urine test and then blood testing.

infarction, but Dr. Rich failed to document a confirmed or alternative interpretation of the EKG. Dr. Rich, however, provided R.H. with a hydrogen peroxide treatment on that date, but the treatment was terminated because of pain at the infusion site.

• Dr. Rich treated patient "R.S." from January 7, 2004, to March 9, 2004. On R.S.'s initial progress note, his medical history included attention deficit hyperactivity disorder, irritable bowel syndrome, and depression. Although Dr. Rich did not conduct a physical exam of R.S., he made a preliminary diagnosis of heavy metal toxicity. A laboratory report ordered by Dr. Rich dated January 23, 2004, showed that R.S. had a post-provocative urine level with three elements beyond the reference ranges stated in the report. However, the report noted that the "[e]lement reference ranges were developed from a healthy population under non-provoked/non-challenged conditions" and that "[p]rovocation with challenge substances is expected to raise the urine level of some elements. . . ." Despite these specified qualifying conditions, on February 5, 2004, Dr. Rich diagnosed R.S. as having heavy metal toxicity and decreased oxidative function. From February 12, 2004, through March 9, 2004, he provided R.S. with six chelation treatments. When the treatment began on February 12, 2004, R.S. had a blood triglyceride level of 122 mg/dL and a calcium level of 9.1 mg/dL, both within the reference range, but on March 2, 2004, R.S. had a blood triglyceride level of 233 mg/dL and a blood calcium level of 10.5 mg/dL, both designated as high on the laboratory report. Dr. Rich failed to document that he consulted with or advised R.S. that during the course of treatment his triglyceride and calcium levels had increased to a high level nor did Dr. Rich make any medical recommendations or initiate any treatments in light of these changes. Moreover, although a February 24, 2004, progress note states "severe depression" and "father wants a consult with Dr. Rich today – wants to know what to do for patient about depression," there is no documentation that Dr. Rich consulted with or advised either R.S. or his father or that he made any medical recommendations or initiated treatments until March 9, 2004, when he provided R.S. with samples of the antidepressant Tofranil.

• Although Dr. Rich did not at any relevant time have a license or certificate that allowed him to provide detoxification treatment programs using methadone HCL, he treated each of twelve additional identified patients in his clinic's "detoxification program" with multiple prescriptions for methadone. As to eleven of those patients, he also failed to obtain copies of any medical records showing that any of them was suffering from any illness or injury before prescribing methadone.

The Board concluded that these facts describing Dr. Rich's protocol with respect to M.H., R.H., R.S., and the other twelve patients established the following:

• Dr. Rich engaged in "[u]nprofessional, dishonorable or unethical conduct," Tenn. Code Ann. § 63-6-214(b)(1), and "[g]ross malpractice or a pattern of continued or repeated

malpractice, ignorance, negligence or incompetence in the course of medical practice." Tenn. Code Ann. § 63-6-214(b)(4);

> • With respect to M.H., R.H., and R.S., Dr. Rich

> > [d]ispens[ed], prescrib[ed] or otherwise distribut[ed] [a] controlled substance or . . . other drug not in the course of professional practice, or not in good faith to relieve pain and suffering, or not to cure an ailment, physical infirmity, or disease, or in amounts and/or for durations not medically necessary, advisable or justified for a diagnosed condition.

Tenn. Code Ann. § 63-6-214(b)(12) and had "[d]ispens[ed], prescrib[ed], or otherwise distribut[ed] [a] controlled substance or other drug to [a] person in violation of [a] law of the United States." Tenn. Code Ann. § 63-6-214(b)(14).

> • Dr. Rich's treatment of the other twelve patients constituted grounds for disciplinary action under rules 0880-02-.14(6)(c) and (e)(3) of the Official Compilation of the Rules and Regulations of the State of Tennessee and 21 U.S. C. § 823(g)(1).

Noting Dr. Rich's "multiple disciplinary violations over a long period, in addition to [his] lack of regard for previous board actions which demonstrates a significant failure in his judgment," the Board suspended his license for one year and ordered him to be evaluated by the Vanderbilt Comprehensive Assessment Program for Professionals and comply with its recommendations, complete a Board-approved comprehensive course in pain management, pay the costs incurred in the prosecution of his case, and ensure the transfer of all of his patients to other medical providers.

Dr. Rich petitioned the Chancery Court for Davidson County pursuant to Tennessee Code Annotated section 4-5-322[9] for review of the Board's decision. After the Chancery Court affirmed the Board's judgment, Dr. Rich appealed to the Court of Appeals. The Court of Appeals affirmed the Board's findings that Dr. Rich had violated Tennessee Code Annotated section 63-6-214(b)(14), rule 0880-02-.14(6)(c) and (e)(3) of the Official Compilation of the Rules and Regulations of the State of Tennessee and 21 U.S.C. §

---

[9] The Tennessee Uniform Administrative Procedures Act is codified at Tennessee Code Annotated sections 4-5-101 to 4-5-325 (2005). Section 4-5-322(a)(1) governs the judicial review of the decision of a state agency such as the Board, providing that "[a] person who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter, which shall be the only available method of judicial review."

823(g)(1). However, upon determining that the Board was required by Tennessee Code Annotated section 63-6-214(g) to articulate the applicable standard of care in its deliberations and that it had failed to do so, the Court of Appeals reversed the Board's ruling that Dr. Rich had violated subsections (1), (4), and (12) of Tennessee Code Annotated section 63-6-214(b), and remanded to the Board for reconsideration of sanctions. We granted the Board's application for permission to appeal and address the issue of whether the Board was required by Tennessee Code annotated section 63-6-214(g) to articulate the applicable standard of care in its deliberations.

The sole issue we address is whether Tennessee Code Annotated section 63-6-214(g) required the Board to articulate the applicable standard of care in its deliberations with regard to whether Dr. Rich violated Tennessee Code Annotated section 63-6-214(b)(1), (4), and (12).[10]

## Analysis

The issue before us is one of statutory construction. The rules of statutory construction are well settled and require that we implement legislative intent without broadening or restricting the statute beyond its intended scope. Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002). We look to "the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning." State v. Flemming, 19 S.W.3d 195, 197 (Tenn. 2000); see In re Adoption of A.M.H., 215 S.W.3d 793, 808 (Tenn.

---

[10] In oral argument before this Court, Dr. Rich's counsel stated that Dr. Rich is requesting that we affirm the judgment of the Court of Appeals as to its reversal of the Board's ruling that Dr. Rich violated Tennessee Code Annotated section 63-6-214(b)(1), (4), and (12) and that he is not requesting that we reverse the Board's ruling that Dr. Rich violated Tennessee Code Annotated section 63-6-214(b)(14); rules 0880-02-.14(6)(c) and (e)(3) of the Official Compilation of the Rules and Regulations of the State of Tennessee and 21 U.S.C. § 823(g)(1). At oral argument, Dr. Rich's attorney conceded that Dr. Rich was not seeking review of the Board's finding that he violated the four provisions not related to a standard of care:

> Counsel: I'm asking that Your Honors affirm the ruling of the Court of Appeals which held that the Board is required to articulate the standard of care if it is going to rule that a licensee has violated it. It's nothing more than the same right that -
>
> Chief Justice Clark: But then your client still stands found to have four other charges, right? So, you're not asking that these be reversed?
>
> Counsel: No, Your Honor. No.

2007) ("Where the statutory language is not ambiguous, . . . the plain and ordinary meaning of the statute must be given effect."). We "'presume that the legislature says in a statute what it means and means in a statute what it says there.'" Gleaves v. Checker Cab Transit Corp., 15 S.W.3d 799, 803 (Tenn. 2000) (quoting BellSouth Telecomms., Inc. v. Greer, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)). When we are called upon to construe the meaning of a statute, our review is de novo without deference to the decision of the court below. Estate of French v. Stratford House, 333 S.W.3d 546, 554 (Tenn. 2011).

The statute at issue in this case, Tennessee Code Annotated section 63-6-214(g), provides as follows:

> For purposes of actions taken pursuant to subdivisions (b)(4), (12) and (13) or any other subsection in which the standard of care is an issue, any Tennessee licensed physician serving as a board member, hearing officer, designee, arbitrator or mediator is entitled to rely upon that person's own expertise in making determinations concerning the standard of care and is not subject to voir dire concerning such expertise. Expert testimony is not necessary to establish the standard of care. The standard of care for such actions is a statewide standard of minimal competency and practice that does not depend upon expert testimony for its establishment. However, *to sustain actions based upon a violation of this standard of care, the board must, in the absence of admissions or other testimony by any respondent or such respondent's agent to the effect that the standard was violated, articulate what the standard of care is in its deliberations.*

(Emphasis added).

Dr. Rich was charged with violation of the standard of care by failing to comply with the requirements of Tennessee Code Annotated sections 63-6-214(b)(1),(4), and (12). Our review of the record confirms that the Board, during its deliberations, did not articulate the applicable standard of care as required by Tennessee Code Annotated section 63-6-214(g). Siddall v. Tenn. Bd. Of Med. Exam'rs., No. M2004-02767-COA-R3-CV, 2006 WL 1763665, at *3 (Tenn. Ct. App. June 27, 2006) ("Although [the Board] is not required to present expert testimony, it must still articulate a standard of care to establish a statewide standard of minimum competency and practice.").

The Board asserts that under subsection (g), it is only required to articulate the standard if there is no expert testimony as to the applicable standard of care and that it

submitted the testimony of two experts establishing such standard. The language of the statute does not support the construction urged by the Board. The statute's language is clear and unambiguous. According to its plain terms, we construe it to mean what it says – that for purposes of any action taken based upon a subsection where the standard of care is an issue, "the board must . . . articulate what the standard of care is in its deliberations." Tenn. Code Ann. § 63-6-214(g). The statute specifies only one exception to this requirement – "admission or other testimony by any respondent or such respondent's agent to the effect that the standard of care was violated." Id. Here, The standard of care was an issue and Dr. Rich did not admit or testify that he ever violated the standard of care. Applying the canon of construction "expressio unius est exclusio alterius," which holds that the expression of one thing implies the exclusion of others, we infer that had the legislature intended to allow the additional exception asserted by the Board, it would have included specific language to that effect. See Amos v. Metro. Gov't of Nashville & Davidson Cnty., 259 S.W.3d 705, 715 (Tenn. 2008).

The requirement that the Board articulate the applicable standard of care in its deliberations serves a twofold purpose. It gives guidance to other physicians practicing medicine in this state as to the standard to which they are expected to conform and informs the reviewing court of the basis for the Board's decision. Articulation of the adopted standard of care is critical in cases where the Department and the respondent physician have not agreed as to the applicable standard of care, and have submitted conflicting expert testimony in that regard. And even where only one party has presented expert testimony to establish the applicable standard, the Board may reject such testimony and determine a different standard based on its own expertise. As this Court has recognized,

> "[e]xpert opinions are not ordinarily conclusive in the sense that they must be accepted as true on the subject of their testimony, but are generally regarded as purely advisory in character; the [triers of fact] may place whatever weight they choose upon such testimony and may reject it, if they find that it is inconsistent with the facts in the case or otherwise unreasonable."

Cocke Cnty. Bd. of Highway Comm'rs v. Newport Util. Bd., 690 S.W.2d 231, 235 (Tenn. 1985) (quoting Am. Jur. 2d Expert and Opinion Evidence § 138 (1967)); accord Gibson v. Ferguson, 562 S.W.2d 188, 189-90 (Tenn. 1976). Moreover, the statute explicitly states that "[e]xpert testimony is not necessary to establish the standard of care" and that "any Tennessee licensed physician serving as a board member . . . is entitled to rely upon that person's own expertise in making determinations concerning the standard of care." Tenn. Code Ann. § 63-6-214(g). Whether the Board adopts the standard of care advanced by an

expert witness or independently determines the standard of care based on its own expertise, the Board must articulate the standard upon which its decision is based to allow the reviewing court to know the standard and assess the validity of the Board's decision. Similarly, when the Board fails to designate the applicable standard of care, a doctor seeking subsequent review of the Board's decision is placed at an unfair disadvantage; unless it is clear what standard the doctor is held to have violated, he or she cannot properly assess the Board's conclusions in that regard and prepare an effective argument on appeal. In Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs, 48 P.3d 505, 510 (Ariz. Ct. App. 2002), the Arizona Court of Appeals, reviewing the board of medical examiners' censure of a physician for unprofessional conduct, recognizing these concerns, stated as follows:

> Not only must the Board identify the standard and articulate the alleged deviation in order to provide the physician under investigation a fair opportunity to respond to a charge of negligence; it must do so in order to provide a reviewing court an opportunity for meaningful review. "Without clearly articulated standards as a backdrop against which the court can review discipline, the judicial function is reduced to serving as a rubber-stamp for the Board's action." Woodfield v. Bd. of Prof'l Discipline of State Bd. of Med., 905 P.2d 1047, 1057 (Idaho Ct. App. 1995).

While we hold that the Board erred in failing to articulate the applicable standard of care in its deliberations, this error does not warrant reversal of the Board's ruling that Dr. Rich violated Tennessee Code Annotated § 63-6-214(b)(1), (4), and (12). This case does not involve an error or deficiency in the administrative hearing or the facts, but rather an error of law and a deficiency in the record. A reviewing court may remand a case to an administrative agency where the agency has committed an error of law or the record presented to the court is inadequate. 73A C.J.S. Public Administrative Law and Procedure § 461 (2004). This procedure does not require a new hearing by the administrative agency, but instead allows the agency to correct noted legal deficiencies based on the existing administrative record. See Lewis v. Bedford Cnty. Bd. Of Zoning Appeals, 174 S.W.3d 241, 247 (Tenn. Ct. App. 2004) (holding that "[w]here the evidence has been preserved but the board or commission has not exercised its responsibility in accordance with legal requirements, a remand to the board for a hearing based on the existing record of the evidence is appropriate"); Hoover, Inc. v. Metro. Bd. of Zoning Appeals for Davidson Cnty., 955 S.W.2d 52, 55 (Tenn. Ct. App. 1997) (remanding case to agency with directions to conduct a new hearing based on the existing record without introduction of additional factual evidence and noting that "[r]eopening the record at this late stage would only give the parties a second bite at the apple"). Accordingly, the error of the Board in failing to articulate the

applicable standard of care is properly resolved by remand to the Board whereupon it is directed to conduct deliberations based on the existing record and articulate during the deliberations the applicable standard of care as required by the statute.

## Conclusion

We hold that the Board was required by Tennessee Code Annotated section 63-6-214(g) to articulate the applicable standard of care in its deliberations. The error warrants remand for correction, rather than reversal, of any of the Board's findings of violations. Accordingly, we vacate the judgment of the trial court affirming the Board's findings that Dr. Rich violated Tennessee Code Annotated section 63-6-214(b)(1), (4), and (12). We further vacate the judgment of the Court of Appeals to the extent it reverses the Board's findings that Dr. Rich violated Tennessee Code Annotated section 63-6-214(b)(1), (4), and (12). Otherwise, the judgment of the Court of Appeals is affirmed, and the cause is remanded to the Board with instructions that it conduct deliberations based on the existing record and articulate the applicable standard of care in its deliberations. Costs are assessed to the Tennessee Board of Medical Examiners, for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE