# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 25, 2015 Session

## ADMINISTRATIVE MANAGEMENT RESOURCES, LLC v. JAMES G. NEELEY

### Appeal from the Chancery Court for Davidson County
### No. 110034II    Carol L. McCoy, Chancellor

_____

### No. M2014-01073-COA-R3-CV – Filed June 23, 2015

_____

A staff leasing company filed this petition for judicial review of the administrative decision of the Tennessee Department of Labor and Workforce Development ("the Department"). In its decision, the Department determined that the company had illegally transferred employees from one entity to another to acquire a lower unemployment insurance premium rate. We affirm the chancery court's decision finding substantial and material evidence to support the Department's determination.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Robert E. Boston, Mark W. Peters, and Michael T. Harmon, Nashville, Tennessee and Arthur M. Fowler, Jr., Johnson City, Tennessee, for the appellant, Administrative Management Resources, LLC.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; and Jason I. Coleman, Assistant Attorney General, for the appellee, Tennessee Department of Labor and Workforce Development.

# MEMORANDUM OPINION[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Administrative Management Resources, LLC ("AMR") was a staff leasing company owned by Rick and Sharon Thomason. Staff leasing companies place employees of a client company onto the leasing company's payroll and then lease the employee back to the client company. The Thomasons also owned other companies that offered services similar to those offered by AMR; one of those companies was ARI. As will be discussed below, a prior case against ARI by the Department is relevant to the Department's claims against AMR in this case.

## SUTA Dumping

The Tennessee Employment Security Law requires all non-governmental covered employers to pay their share of state unemployment tax act ("SUTA") premiums to the Department. Tenn. Code Ann. §§ 50-7-402, 50-7-403 (2006).[2] Employers can pay their premiums in one of two ways: a flat sum equal to 5.5% of wages, or according to a formula based upon their individual reserve experience. Tenn. Code Ann. §§ 50-7-402(a), 50-7-403(b) (2006). The premium for an employer that pays based upon its individual reserve experience is determined as follows: the total benefits charged to the employer's account are subtracted from the amount of premiums paid by the employer. Tenn. Code Ann. § 50-7-403(b)(1)(A) (2006). The difference is divided by the average taxable payroll for the most recent three-year period, yielding a reserve ratio, which is the employer's premium rate. *Id.*

Tennessee Code Annotated section 50-7-403(b) (2006) contains provisions aimed at prohibiting companies from and penalizing companies for engaging in the practice of "SUTA dumping," which occurs when an employer manipulates the experience rating system to obtain a more favorable premium rate. The employer typically accomplishes the goal of SUTA dumping by transferring payroll, benefits, and premium experience to a company with a lower rate in order to pay lower SUTA premiums. The Department is

---

[1] Tenn. R. Ct. App.10 states:

> This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion, it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

[2] The relevant audit is for the time period from 2005 through 2008. The new SUTA provisions (discussed below), which allow for a two-percent penalty, took effect on January 1, 2006, and are substantially similar to the current provisions.

responsible for making sure that employers pay their SUTA taxes in full. *See* Tenn. Code Ann. §§ 50-7-403, 50-7-452.

Prior to January 1, 2006, the relevant provisions of the Employment Security Law provided as follows:

> Notwithstanding any of the foregoing provisions of this section, if the administrator finds in any case that the acquisition of any business or a distinct, severable, identifiable and segregable part thereof is made solely or primarily for the purpose of obtaining a more favorable rate of premiums, the transfer of accounts shall not be approved. The acquisition shall be deemed to have been made solely or primarily for such purpose if the administrator finds an absence of any reasonable business purpose of the acquisition other than a more favorable premium rate.

Tenn. Code Ann. § 50-7-403(b)(5)(A) (2005). The 2005 law also stated:

> No total or partial transfer of taxable payroll, benefit and premium experience may be made without the written consent of all employers or employing units involved and filed with the division of employment security during the calendar quarter in which the acquisition occurs or during the calendar quarter immediately following such quarter.

Tenn. Code Ann. § 50-7-403(b)(4) (2005).

A major revision to the SUTA provisions occurred during the 2005 General Assembly and took effect on January 1, 2006. *See* 2005 TENN. PUB. ACTS ch. 357, §§ 2-9. The relevant provisions include the following:

> (C) Notwithstanding any other law, this subdivision (b)(2)(C) shall apply regarding assignment of premium rates and transfer of benefit and premium experience of an employer's trade or business, or a portion of an employer's trade or business, to another employer, if, at the time of the transfer, there is any common ownership, management or control of the two (2) employers. In such cases, the benefit and premium experience attributable to the transferred trade or business shall be transferred to the employer to whom the trade or business is so transferred. The reserve ratios and premium rates of both employers shall be recalculated and made effective immediately upon the date of the transfer of the trade or business.
> . . .
> (D) If, following a transfer of experience under subdivision (b)(2)(C), the administrator, pursuant to the factors in subdivision (b)(2)(F), determines that a substantial purpose of the transfer of trade or business was to obtain a

reduced liability for premiums, the experience rating factors of the employers involved shall be combined into a single account and a single premium rate assigned to the account as of the date of the transfer.

. . .

(F) In determining whether a business was acquired, or a transfer of a trade or business, or a portion of a trade or business, was made solely or primarily or substantially for the purpose of obtaining a lower rate of premiums, the administrator shall use objective factors, which may include the cost of acquiring the business, whether the person or employing unit continued the business enterprise of the acquired business, how long the business enterprise was continued, or whether a substantial number of new employees were hired for performance of duties unrelated to the business activity conducted prior to acquisition.

Tenn. Code Ann. § 50-7-403(b)(2)(C)(D) & (F) (2006).

## Previous decision

In 2004, the Department performed an audit of ARI, Inc., d/b/a Southgate Styling Salon, another company owned by the Thomasons, for the period from January 2002 through the end of March 2004. *ARI, Inc. v. Neeley*, No. M2011-02272-COA-R3-CV, 2012 WL 3157120, at *1 (Tenn. Ct. App. Aug. 3, 2012). Based upon the audit, the Department determined that ARI had engaged in "a practice of reporting wages for unemployment insurance premium purposes that violate[d] the experience rating principles of the Tennessee Employment Security Law." *Id.* The Department found that ARI owed a total of over half a million dollars in unpaid unemployment insurance premiums and interest. *Id.* ARI appealed through the administrative process. *Id.* at *1-2. The Department issued a 102-page redetermination decision including detailed findings of fact and affirming its initial determination. *Id.* at *1. At all remaining levels of administrative review, the Department affirmed the original decision finding ARI liable,[3] but the amount owed was determined to be higher when recalculated. *Id.* at *1-3.

---

[3] The decision of the Appeals Tribunal includes the following factual findings:

A.R.I.'s SUTA premium rate was calculated to be 3.3%.

On or about April 2002, A.R.I. acquired a beauty salon doing business as Southgate Styling Salon ("Southgate"). Southgate was taxed at a SUTA premium rate of .20%. The employer [A.R.I.] then began shifting its payroll from entities under its control to the payroll of Southgate. By December, 2002 there were 100 employees being compensated on Southgate's payroll. By the end of the second quarter of 2003, more than a thousand employee payroll accounts had been transferred to Southgate.

. . .

4

ARI appealed to chancery court, arguing that the transfers were for a reasonable business purpose and that the Department's decisions upholding the redetermination decision violated due process because the Department "purport[ed] to establish liability based upon an argument for which ARI was offered no notice prior to the hearing," namely—failure to notify the Department of the transfers. *Id.* at \*3. The chancery court rejected ARI's due process argument because ARI failed to raise it below and had failed to show any prejudice. *Id.* at \*4. The court also found evidence to support the Department's finding of the amount of underpaid SUTA premiums. *Id.*

On appeal to this Court, ARI argued that its due process rights had been violated, that the remedy ordered in the redetermination decision—the aggregation of multiple accounts—was not allowed when calculating its liability, and that the Department had not substantiated its claim regarding the amount of taxes owed by ARI. *Id.* This Court rejected all three of ARI's arguments. *Id.* at \*9. As to the argument regarding the aggregation of multiple accounts, the Department cited Tenn. Code Ann. §§ 50-7-403(b)(2)(A) and (5)(B) as authority for its actions. *Id.* at \*7. At that time, those two provisions stated, in pertinent part:

> (2)(A) In the event of a successorship or merger of employers or employing units and the combined or successor employer is a new entity, the combined taxable payroll, benefit and premium experience of the employers or employing units involved shall be computed as of the effective date of successorship or merger to determine a new reserve ratio and premium rate applicable to the combined or successor employer. In the event that any employing unit subsequent to January 1, 1951, acquires or has acquired a distinct, severable, identifiable and segregable portion of the business of an employer and continues or has continued such an acquired portion of the business of the predecessor, the successor shall succeed to that part of the taxable payroll, benefit, and premium experience of the predecessor which is attributable solely to that portion of the business which was acquired. . . .
> . . .
> (5)(B) Unless and until it has been shown to the satisfaction of the administrator that both the successor and the predecessor are not the same parties of interest, any successor, whether or not an employer at the time of acquisition, that is controlled either directly or indirectly by legally enforceable means or other wise by an individual, type of organization, or

---

A visit to the premises of Southgate on July 12, 2004 by two Agency auditors uncovered the fact that Southgate was occupied and being operated by only three working hairstylists.

*ARI*, 2012 WL 3157120, at \*1-2.

5

employing unit having a commonality of beneficial interest or interests as those of the predecessor will be considered the same party of interests as the predecessor and will acquire the experience rating factors of the predecessor employer. These factors consist of premiums paid, benefit experience, annual taxable payrolls of the predecessor employer, and any remaining liabilities. . . .

*Id.* at *7. This Court determined that Mr. Thomason made employee transfers that "fell within the purview" of these statutes. *Id.* at *8. We affirmed the decision of the chancery court. *Id.* at *9.

### Current Department claims against AMR

In 2009, while ARI's administrative appeal of its redetermination decision was pending, the Department initiated an audit against AMR covering the period from 2005 to 2008. On March 23, 2009, the Department sent AMR a notice of determination and premium rate stating that AMR; Blue Ridge Management Services, LLC; Payroll Transfers LLC; Administrative Resources P/R; Staffing Solutions, Inc.; ARI, Inc./Southgate Styling Salon; ARI Payroll Transfers DIV; and Human Resource Services, Inc. were "subject to transfer of experience ratings pursuant to T.C.A. 50-7-403(b)(2)(C)." All of these companies had been determined to be under "common management and control." The notice further provided that these companies were subject to a penalty for violating Tenn. Code Ann. § 50-7-403(b)(2) by failing to notify the Department of mandatory transfers that would have resulted in higher premium rates. The Department, therefore, assessed a penalty of 2% in accordance with Tenn. Code Ann. § 50-7-403(b)(2)(G).

The Department transferred the experience rating of each of the other companies (other than AMR) to AMR beginning with the first quarter of 2005. As a result, as of the first quarter of 2009, the new premium rate for AMR would be 4.5%. The 2% penalty for failure to provide the information necessary to determine the correct experience rating would be assessed from January 1, 2006 through June 30, 2009. The additional premium due, plus interest and 2% penalty, was calculated to be $1,601,359.45.

AMR filed an application for review of this notice of determination. On July 20, 2009, the Department issued a Redetermination Decision in which it agreed that the companies had violated the Tennessee Employment Security Act ("TESA"), but determined that the amount due was less than previously calculated, $1,505,683.78. On May 10, 2010, after a hearing,[4] the Appeals Tribunal affirmed the Redetermination

---

[4] The hearing in AMR's case took place on March 3, 2010, the same day as the hearing on ARI's appeal of the redetermination decision in its case. The hearing in AMR's case included the testimony of one witness: Mr. Thomason. The parties stipulated that all of the testimony given by Mr. Thomason at the hearing earlier that day in the ARI case would be incorporated into the hearing in the AMR case. Mr.

Decision, and on November 29, 2010, the Board of Review affirmed the Appeals Tribunal.

On January 10, 2011, AMR filed a petition for judicial review in chancery court. AMR argued, *inter alia*, that the movement of employees was not made with the substantial purpose of reducing SUTA taxes; that the "lower tribunal" abused its discretion in accepting the argument that AMR should have corrected the Department's failure to aggregate the SUTA accounts of AMR's related companies; that the lower tribunal's decision was in violation of due process because it purported to base liability upon an argument for which AMR had no notice; that the decision of the lower tribunal was in violation of pertinent statutory provisions in allowing the Department to aggregate employer accounts without statutory authority; that there was no basis or support to show that Mr. Thomason's companies "knowingly" attempted to avoid paying SUTA taxes; and that the decision of the lower tribunal was made upon unlawful procedure because the hearing officer issued an opinion while the hearing was still open to allow the parties an opportunity to submit proposed findings of fact and conclusions of law and because AMR was not offered a three-member panel to review the decision of the hearing officer.

The chancery court found no merit in AMR's arguments. We will consider the court's analysis in detail as relevant below. AMR has appealed the decision of the chancery court.

ISSUES ON APPEAL

AMR has raised multiple issues on appeal, which we restate as follows: (1) whether the trial court erred in upholding a decision requiring AMR to aggregate multiple SUTA tax accounts into one, recalculate the SUTA taxes under the aggregated account, and pay additional taxes; (2) whether the trial court erred in upholding the Department's finding that AMR knowingly violated TESA; and (3) whether the procedural flaws in the hearing violated AMR's due process rights.

STANDARD OF REVIEW

In reviewing an unemployment compensation case, this Court employs the same standard of review as that used by the chancery court below. *Armstrong v. Neel*, 725 S.W.2d 953, 955 n.1 (Tenn. Ct. App. 1986). Tennessee Code Annotated section 50-7-304(i)(2)-(3) sets out the principles that govern the chancellor's review:

(2) The chancellor may affirm the decision of the commissioner or the chancellor may reverse, remand or modify the decision if the rights of the

---

Thomason testified (in the AMR hearing) that the transfers of employees made between AMR and the other companies involved in the present case were made to obtain more favorable workers' compensation rates. The record in the present appeal does not contain the transcript of the hearing in the ARI case.

7

petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(A) In violation of constitutional or statutory provisions;
(B) In excess of the statutory authority of the agency;
(C) Made upon unlawful procedure;
(D) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(E) Unsupported by evidence that is both substantial and material in the light of the entire record.

(3) In determining the substantiality of evidence, the chancellor shall take into account whatever in the record fairly detracts from its weight, but the chancellor shall not substitute the chancellor's judgment for that of the commissioner's designee as to the weight of the evidence on questions of fact. No decision of the commissioner's designee shall be reversed, remanded or modified by the chancellor, unless for errors that affect the merits of the final decision of the commissioner's designee.

Substantial and material evidence has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.'" *City of Memphis v. Civil Serv. Comm'n*, 239 S.W.3d 202, 207 (Tenn. Ct. App. 2007) (quoting *Dickson v. City of Memphis Civil Serv. Comm'n*, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005)); *accord McClellan v. Bd. of Regents of State Univ.*, 921 S.W.2d 684, 691 (Tenn. 1996). Substantial evidence requires "something less than a preponderance of the evidence but more than a scintilla or a glimmer." *Ware v. Greene*, 984 S.W.2d 610, 614 (Tenn. Ct. App. 1998) (citing *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988)); *see McEwen v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 821 n.10 (Tenn. Ct. App. 2005) (noting that the "preponderance of the evidence" standard is harder to satisfy than the "substantial and material evidence" standard).

We may overturn an administrative agency's factual findings "only if a reasonable person would necessarily reach a different conclusion based on the evidence." *Davis v. Shelby Cnty. Sheriff's Dep't*, 278 S.W.3d 256, 265 (Tenn. 2009); *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001). Our function in reviewing the Board of Review's application of the statute has been described as "severely limited." *Sabastian v. Bible*, 649 S.W.2d 593, 594 (Tenn. Ct. App 1983). "All that is needed to support the commission's interpretation is that it has warrant in the record and a reasonable basis in law." *Id.* at 594-95. Moreover, "[c]ourts should not disturb a reasonable decision of any agency which has expertise, experience and knowledge in a particular field." *Millen v. Tenn. Dep't. of Labor & Workforce Dev.*, 205 S.W.3d 929, 932 (Tenn. Ct. App. 2006) (quoting *Ford v. Traughber*, 813 S.W.2d 141, 144 (Tenn. Ct. App. 1991)).

ANALYSIS

### (1)(A) <u>Statutory violation</u>

The first issue is whether the trial court erred in upholding the Department's determination that AMR violated TESA by engaging in SUTA dumping—transferring employees among its various companies to avoid unemployment insurance premiums. There is no debate that, during the period from 2005 through 2008, AMR made transfers of employees among companies commonly owned, operated, and managed by Mr. Thomason and that, as a result, AMR and the other entities paid significantly less in unemployment taxes than they would have without the transfers. AMR asserts that, contrary to the Department's contention, AMR did provide actual notice to the Department of its employee transfers. Therefore, AMR argues, it did not violate TESA.

AMR and the Department agree that AMR was required to provide the Department with notice of the transfers of employees, but they do not agree on the contents of that notice. We have determined that AMR waived the notice issue by failing to raise it in the chancery court. Issues not raised in a party's petition for review before the chancery court are considered waived on appeal. *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 670 (Tenn. 2013); *McClellan*, 921 S.W.2d at 690; *Rich v. Tenn. Bd. of Med. Exam'rs*, No. M2009-00813-COA-R3-CV, 2010 WL 3565668, at *4 (Tenn. Ct. App. Sept. 14, 2010), *aff'd in part, vacated in part*, 350 S.W.3d 919 (Tenn. 2011).

Another argument made by AMR with respect to the trial court's finding that it violated TESA is that an employer cannot be found liable for additional SUTA taxes if it pays according to the official tax notices sent to it by the Department. This argument must fail. As the Department points out, it had no way of knowing that its notices were incorrect unless and until AMR provided it with proper notice of the employee transfers at issue here. Without that information, the Department could not correct the information upon which its tax notices were based.

### (1)(B) <u>Aggregating accounts</u>

Having failed to show that the trial court erred in concluding that AMR violated Tenn. Code Ann. § 50-7-403, we must consider the issue of whether the Department had the authority to require AMR to aggregate multiple SUTA tax accounts into one and recalculate the SUTA taxes under the aggregated account.

AMR begins by arguing that Tenn. Code Ann. § 50-7-403(b)(2)(C) does not allow the Department to aggregate multiple commonly-owned employer accounts, only two accounts. Subsection (b)(2)(C) applies to the "assignment of premium rates and transfers

of benefit and premium experience of an employer's trade or business," or a portion thereof, to another employer, if there is "any common ownership, management or control *of the two (2) employers*." (Emphasis added). If so, "the benefit and premium experience attributable to the transferred trade or business shall be transferred to the employer to whom the trade or business is so transferred." Tenn. Code Ann. § 50-7-403(b)(2)(C). Subsection (b)(2)(D), however, is the key provision:

> If, following a transfer of experience under subdivision (b)(2)(C), the administrator, pursuant to the factors in subdivision (b)(2)(F), determines that a substantial purpose of the transfer of trade or business was to obtain a reduced liability for premiums, the experience rating factors of the *employers involved* shall be combined into a single account and a single premium rate assigned to the account as of the date of the transfer.

Tenn. Code Ann. § 50-7-403(b)(2)(D) (emphasis added). This is the provision relied upon by the Department to authorize its aggregation of the employer accounts involved in AMR's case. In *ARI v. Neeley*, 2012 WL 3157120, at *7-8, this Court determined that the statutes in effect in 2005 (Tenn. Code Ann. § 403(b)(2)(A), quoted above) allowed the aggregation of multiple accounts. Mindful of the deference due to the Commissioner, *Ford*, 813 S.W.2d at 144, we agree with the Department that Tenn. Code Ann. § 50-7-403(b)(2)(D) (2006) also authorizes the aggregation of multiple accounts.

AMR's chief assertion with respect to Tenn. Code Ann. § 50-7-403(b)(2)(D) is that the Department failed to show that a "substantial purpose of the transfer . . . was to obtain a reduced liability for premiums." AMR further alleges that the Department accepted Mr. Thomason's testimony that the transfers were made to help secure more favorable workers' compensation insurance.

In examining whether there is substantial and material evidence to support a finding of substantial purpose, it is important to keep in mind that substantial and material evidence requires "something less than a preponderance of the evidence but more than a scintilla or a glimmer." *Ware*, 984 S.W.2d at 614. Moreover, substantial evidence "is not limited to direct evidence but may also include circumstantial evidence or the inferences reasonably drawn from direct evidence." *Wayne Cnty.*, 756 S.W.2d at 280. Courts "do not substitute their judgement for that of the agency as to the weight of the evidence, even when the evidence could support a different result." *Id.* at 279 (citations omitted).

Pursuant to Tenn. Code Ann. § 50-7-403(b)(2)(F), the Department is to rely upon "objective factors" in determining whether a business was transferred "solely or primarily or substantially for the purpose of obtaining a lower rate of premiums." Such objective factors include "whether a substantial number of new employees were hired for performance of duties unrelated to the business activity conducted prior to acquisition."

10

Tenn. Code Ann. § 50-7-403(b)(2)(F). The Appeals Tribunal[5] made the following observations concerning other objective factors (not listed in the statute): "Perhaps the most obvious such factor is the overall fiscal effect of the transfer on the employer. In other words, what net benefit or detriment to the employer would the employer realize if the transfer were to be allowed?" The Board of Review stated: "Although there may have been another intent involved in moving the employees [obtaining workers' compensation benefits], the result is still that the employer did not report the changes to the department as required and failed to pay the appropriate tax rate."

What evidence is there in the record to support a finding that a substantial purpose of AMR's transfers was to reduce its liability for SUTA premiums? In its Redetermination Decision, the Department determined that the difference between what AMR would have paid if it had properly reported and transferred experience ratings and what it actually paid was $890,278.50. (With a two percent penalty, the total was $1,505,683.76). The Redetermination Decision states: "Mr. Thomason has previously been notified by the department of the requirements under T.C.A. § 50-7-403 from previous determinations regarding A.R.I., Inc. dba Southgate Styling Salon . . . ." The Board of Review stated:

> Although there may have been another intent involved in moving the employees, the result is still that the employer did not report the changes to the department as required and failed to pay the appropriate tax rate. . . . The employer knowingly continued the practice of transferring employees between the business entities following a prior audit and decision of such violation in 2005.

The chancery court stated that, "Mr. Thomason did not refute the Department's finding that AMR's actions amount to SUTA dumping." Simply asserting that AMR acted to obtain more favorable workers' compensation insurance is not enough. The record contains ample evidence to support a finding that a substantial purpose of AMR's actions was to reduce its liability for SUTA premiums.

### (2) "Knowingly" requirement

Tennessee Code Annotated section 50-7-403(b)(2)(G) (2006) provides: "Any person or employing unit that *knowingly violates* or attempts to violate this section . . . shall be subject to" the statutory penalties. (Emphasis added). The term "knowingly" is defined to mean "having actual knowledge of or acting with deliberate ignorance or reckless disregard for the prohibition involved." Tenn. Code Ann. § 50-7-

---

[5] The decision of the Appeals Tribunal is somewhat confusing because, in parts, it references the facts pertaining to the previous audit involving ARI. It also, however, references the liability applicable to AMR in the present case and discusses legal principles relevant to the issues in this case.

403(b)(2)(H)(i). AMR asserts that the chancery court erred in upholding a penalty against it for knowingly violating the TESA.

Upon what basis was AMR determined to have knowingly violated the Act? As quoted above, the Board of Review stated that AMR "knowingly continued the practice of transferring employees between the business entities following a prior audit and decision of such violation in 2005." This suggests that the prior audit and decision put AMR in the position of "knowing" that its practice of transferring employees was improper and in violation of the statute. In its decision, the chancery court stated:

> In light of the fact that AMR had notice of statutory requirements, due to previous determinations related to ARI . . . and because all employers are charged with familiarizing themselves with the requirements of the law that governs their actions, the Board of Review held that there was substantial and material evidence that AMR "knowingly" violated [TESA].

We cannot agree with the second prong of the chancery court's statement, regarding employers' duty to familiarize themselves with the law, as this would effectively write the "knowingly" requirement out of the statute by making all violations of the act knowing. In this case, AMR had knowledge of the statutory requirements as a result of its experience with ARI. Under these circumstances, we find substantial and material evidence to support the trial court's finding that AMR knowingly violated the statute and was properly assessed penalties.[6]

### (3) Due process

Finally, AMR argues that it was deprived of procedural due process because it was not afforded a full and fair hearing. After the administrative hearing before the Appeals Tribunal on March 3, 2010, the hearing officer stated that he would keep the hearing open pending the submission of proposed findings of fact and conclusions of law and post-hearing briefs, which were to be submitted within thirty days of receipt of the hearing transcripts. On May 10, 2010, before the parties had even received the hearing transcript, the hearing officer issued an opinion affirming the Redetermination Decision. Because the parties never had a chance to submit proposed findings of fact and

---

[6] AMR also includes an argument that the chancery court erred in allowing the retroactive application of the taxing statutes. The basis of this argument is AMR's assertion that the Department applied the new statute that took effect on January 1, 2006 to actions that occurred prior to that date. Most of the statements made by AMR to support this assertion are not accompanied by citations to the record; the few citations to the record are to the pleadings. Moreover, the Department cites its Report of Field Investigation, the basis of its initial decision in this case, which clearly delineates the AMR case as covering the period from the first quarter of 2005 through the fourth quarter of 2008 and states that the new statute was applied only as of January 1, 2006.

12

conclusions of law or post-hearing briefs, AMR contends that it was not afforded a full and fair hearing.

Although "due process does not dictate particular procedures in every instance, administrative proceedings must afford parties: 1) adequate notice, 2) an opportunity for a hearing at a meaningful time and in a meaningful manner, and 3) an opportunity to obtain judicial review of the board's or agency's decision." *ARI*, 2012 WL 3157120, at *5. The question here is whether AMR was afforded a meaningful hearing, which requires "a fair trial before a neutral or unbiased decision-maker." *Martin*, 78 S.W.3d at 264. In its decision, the chancery court noted that neither the Rules of Civil Procedure nor the common law rules of evidence generally apply before administrative bodies:

> Accordingly, in reviewing decisions from these "less than legally formal hearings," appellate courts are guided, not by the Rules of Evidence, but instead "by a sense of fair play and the avoidance of undue prejudice to either side of the controversy and [must determine] whether . . . the action of the hearing Board in admitting or excluding evidence was unreasonable or arbitrary." *Goodwin* [*v. Metro. Bd. of Health*, 656 S.W.2d 383, 388 (Tenn. Ct. App. 1983)].

*Davis v. Shelby Cnty. Sheriff's Dep't*, 278 S.W.3d 256, 266 (Tenn. 2009). Thus, in evaluating whether AMR was afforded a meaningful hearing, we are guided not by the formal rules of civil procedure but by a general "sense of fair play and the avoidance of undue prejudice to either side of the controversy." *Id.*

As the Department points out, AMR does not dispute that both sides were allowed a fair opportunity to examine witnesses and present evidence before the hearing officer. All of the deficiencies cited by AMR—not being able to submit findings of fact and conclusions of law and post-trial briefs—were experienced equally by both parties. Moreover, as stated by the chancery court, AMR does not cite evidence to support a contrary result in the case.

AMR also makes another due process argument: that the Department violated its due process rights by failing to provide adequate notice of the Department's claim. According to AMR, "the Department did not provide notice of its true claim against Administrative Management before the administrative hearing." AMR does not explain what the "true claim" is alleged to be, but cites to the previous decision regarding ARI in which the court determined that ARI was notified of the Department's finding of a violation of Tenn. Code Ann. § 50-7-403(b)(4) (2005) (regarding failure to provide notice of transfers to the Department) in the Appeals Tribunal decision and did not ask the Board of Review to reopen the proof on the notice issue, thereby waiving the issue. *ARI*, 2012 WL 3157120, at *6. AMR does not explain how this reasoning applies here.

13

Failure to notify was specifically set forth in the original notice of determination in this case. We find no merit in this argument.[7]

At the end of its brief, AMR also includes a one-sentence argument: "The record contains no evidence that the Department correctly calculated the amount of taxes and penalties it claims Administrative Management owes." AMR provides no argument, citation of authority, or proposed calculation to support this conclusion. This court has addressed a party's duty to construct an argument and waiver by failing to do so:

> A skeletal argument that is really nothing more than an assertion will not properly preserve a claim, especially when the brief presents a multitude of other arguments. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam). It is not the function of the appellate court to research and construct the parties' arguments. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). The Appellant's Brief "should contain an argument setting forth the contentions of the appellant with respect to the issues presented with citations to the authorities and appropriate references to the record." *Rhea County v. Town of Graysville*, No. E2001-02313-COA-R3-CV, 2002 Tenn. App. LEXIS 539, at *20, 2002 WL 1723681, at *7 (Tenn. Ct. App. July 25, 2002); *see also Berkowitz*, 927 F.2d at 1384. The failure of a party to cite to any authority or to construct an argument regarding his position on appeal constitutes waiver of that issue. *See Rector v. Halliburton*, No. M1999-02802-COA-R3-CV, 2003 Tenn. App. LEXIS 149, at *25, 2003 WL 535924, at *9 (Tenn. Ct. App. Feb. 26, 2003) (per curiam); *Rhea County*, 2002 Tenn. App. LEXIS 539, at *19-20, 2002 WL 1723681, at *7.

*Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400-01 (Tenn. Ct. App. 2006). AMR's argument fails to comply with the requirements of Tenn. R. App. P. 27(a)(7), which requires a party's brief to include reasons for its contentions, citations to authorities, and appropriate references to the record. AMR has waived this issue on appeal. *See Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000) (courts routinely hold that failure to make appropriate references to the record and cite relevant authority constitutes waiver of the issue).

---

[7] This due process argument was not mentioned in the chancery court's decision.

CONCLUSION

We affirm the judgment of the chancery court. Costs of appeal are assessed against the appellant, AMR, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE