FILED

12/17/2020

Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 2, 2020 Session[1]

### JARED EFFLER ET AL. v. PURDUE PHARMA L.P. ET AL.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Campbell County**
**No. 16596      John D. McAfee, Judge**

———————————————————

**No. E2018-01994-SC-R11-CV**

———————————————————

Declaring that the sale and distribution of illegal drugs affects every community in the country, the Tennessee Legislature enacted the Tennessee Drug Dealer Liability Act, Tennessee Code Annotated sections 29-38-101 to -116. This Act provides a cause of action against a knowing participant in the illegal drug market for injuries caused by illegal drug use. In response to the opioid epidemic in East Tennessee, seven District Attorneys General and two Baby Doe plaintiffs sued several drug companies under the Act. The District Attorneys and the Baby Doe plaintiffs alleged that the drug companies knowingly participated in the illegal drug market by intentionally flooding East Tennessee communities with prescription opioid medications, leading to widespread addiction and diversion of the opioids into the black market. The District Attorneys claimed that the opioid epidemic had damaged the communities in their districts, and the Baby Doe plaintiffs alleged that they were harmed by exposure to opioids in utero. The drug companies moved to dismiss the lawsuit on the pleadings. Their two-fold challenge asserted that the Act did not authorize the District Attorneys to sue for damages and that the Act did not apply to the drug companies' conduct. The trial court ruled that the Act did not apply and dismissed the case. The Court of Appeals reversed. The issues we decide are whether the District Attorneys had statutory standing to sue under the Act and whether the Act applies to the drug companies based on factual allegations in the complaint that the drug companies knowingly participated in the illegal drug market. We hold that the District Attorneys lack standing because the Act does not name them as parties who can sue under the Act. This leaves the Baby Doe plaintiffs, who alleged facts showing that the drug companies knowingly participated in the illegal drug market by facilitating the marketing or distribution of opioids. Taking these factual allegations as true, as required at this stage

———————————————

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

of the case, we hold that the Baby Doe plaintiffs have stated a claim against the drug companies under the Act.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed in Part, Reversed in Part; Judgment of the Trial Court Reversed; Remanded to the Trial Court**

SHARON G. LEE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Ronald S. Range, Jr. and Chad E. Wallace, Johnson City, Tennessee; Ingo W. Sprie, Jr., New York, New York; R. Stanton Jones, Washington, D.C.; Anthony J. Franze, Washington, D.C.; Tim Warnock and Stuart Burkhalter, Nashville, Tennessee; Megan R. Braden, Chicago, Illinois (on application for permission to appeal); Steven A. Reed, Philadelphia, Pennsylvania (on application for permission to appeal); Wendy West Feinstein, Pittsburgh, Pennsylvania; and Brian M. Ercole, Miami, Florida, for the appellants, Endo Health Solutions Inc., Endo Pharmaceuticals Inc., and Teva Pharmaceuticals USA, Inc.

Michael J. Wall, James G. Stranch, III, J. Gerard Stranch, IV, Tricia Herzfeld, Benjamin A. Gastel, and Anthony Orlandi, Nashville, Tennessee; William C. Killian, Chattanooga, Tennessee; and L. Jeffrey Hagood, Bradley H. Hodge, and Timothy A. Householder, Knoxville, Tennessee, for the appellees, Jared Effler, District Attorney General–Eighth Judicial District; Charme Allen, District Attorney General–Sixth Judicial District; Dave Clark, District Attorney General–Seventh Judicial District; Russell Johnson, District Attorney General–Ninth Judicial District; Stephen Crump, District Attorney General–Tenth Judicial District; Jimmy Dunn, District Attorney General–Fourth Judicial District; Mike Taylor, District Attorney General–Twelfth Judicial District; Baby Doe #1; and Baby Doe #2.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Brant Harrell, Senior Assistant Attorney General; Laura Kidwell, Assistant Solicitor General; and Miranda Jones, Assistant Attorney General, for the amicus curiae, State of Tennessee.

Jerry Estes, Nashville, Tennessee, for the amicus curiae, Tennessee District Attorneys General Conference.

Philip S. Goldberg, Washington, D.C., and Tara L. Swafford and Elizabeth G. Hart, Franklin, Tennessee, for the amici curiae, Pharmaceutical Research and Manufacturers of America and American Tort Reform Association.

Richard L. Neumeier, Boston, Massachusetts, and Charles Michels, Nashville, Tennessee, for the amicus curiae, International Association of Defense Counsel.

**OPINION**

**I.**

The Drug Dealer Liability Act[2] provides a civil remedy for damages to persons and entities injured by illegal drug use. The United States Virgin Islands and at least eighteen states, including Tennessee, have adopted a form of the Model Drug Dealer Liability Act.[3] The Model Act has been described as "essentially a products liability act for illegal drugs." *Overview*, Model Drug Dealer Liability Act, www.modelddla.com/Overview_of_the_Model_Drug-Dealer_Liability_Act.htm (last visited Oct. 26, 2020). The intent of the Model Act was to overcome evidentiary difficulties inherent in actions against drug dealers by creating a form of market liability to hold them liable for the injuries caused by their involvement in the illegal drug market. George L. Blum, Annotation, *Validity, Construction, and Application of State Drug Dealer Liability Acts*, 12 A.L.R.7th Art. 2 § 2 (2016) (citing *Schafer v. Shopko Stores, Inc.*, 741 N.W.2d 758 (S.D. 2007)); Joel W. Baar, Note, *Let the Drug Dealer Beware: Market-Share Liability in Michigan for the Injuries Caused by the Illegal Drug Market*, 32 Val. U. L. Rev. 139, 144 (1997). The standard of proof to establish causation was relaxed because the covert nature of the illegal drug market usually prevents injured parties from identifying the specific drug dealers who cause their injuries. Baar, *supra*, at 144. Under the Model Act, a plaintiff may either prove that the defendant sold illegal drugs to the user *or* that the defendant was a dealer of the same drugs in the community when the user consumed the drugs. *Market Liability*, Model Drug Dealer Liability Act, www.modelddla.com/Explanation_of_DDLA_Market_Liability.htm (last visited Oct. 26, 2020). Although market liability has in some cases been shown to have a harmful effect on

---

[2] Tenn. Code Ann. §§ 29-38-101 to -116.

[3] Arkansas, California, Colorado, Georgia, Hawaii, Illinois, Indiana, Louisiana, Michigan, New Hampshire, New Jersey, New York, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, United States Virgin Islands, and Virginia have adopted forms of the Model Drug Dealer Liability Act. Florida and Maryland have also enacted Drug Dealer Liability Acts, but not based on the Model Act. 145 Am. Jur. Trials 1 § 3, Westlaw (database updated August 2020).

- 3 -

legitimate industries, the Model Act intends for its statutorily created market liability to have a damaging effect on the illegal drug market. Baar, *supra*, at 144–45 & n.32.

Tennessee's Act expressly creates market liability "for those who intentionally join the illegal drug market." Tenn. Code Ann. § 29-38-103(9) (2012). The Act begins with a statement of its purposes, including that the Act allows injured persons to recover damages from those who have joined the illegal drug market; shifts the costs of the illegal drug market to those who profit from the sale of illegal drugs; and deters others from entering the illegal drug market. *See id.* § 29-38-102 (2012). The Legislature found that the illegal drug market takes a substantial toll on society, including the families, employers, and insurers of illegal drug users, and consumes an enormous amount of state and local resources. *Id.* § 29-38-103(1). The Legislature recognized that the civil justice system is a viable way to compensate those who have suffered harm from the illegal drug market at the expense of those who have engaged in it. *Id.* § 29-38-103(2). The Act aims to shift the costs of injuries caused by illegal drug use to the dealers who benefit from the illegal drug market. *Id.*

Thus, the Legislature created a statutory cause of action for family members of drug users, including babies exposed to illegal drugs in utero; employers, insurers, medical facilities, governmental entities, and others that have expended resources on behalf of an illegal drug user; and anyone injured by the actions of an illegal drug user against those "who knowingly participate in the illegal drug market in Tennessee." *Id.* § 29-38-106(a) (2012); *id.* § 29-38-105(a) (2012); *Dunaway v. Purdue Pharma, L.P.*, 391 F. Supp. 3d 802, 810 (M.D. Tenn. 2019) (quoting *Waters v. Farr*, 291 S.W.3d 873, 915 (Tenn. 2009)). A knowing participant in the illegal drug market includes distributors of illegal drugs or those in the chain of distribution. Tenn. Code Ann. § 29-38-106(b)(1); *see also, e.g.*, Tenn. Att'y Gen. Op. No. 13-01, *Liability for Infants Born with Narcotic Drug Dependency*, at 2 (2013). A plaintiff must prove the defendant's participation in the illegal drug market by clear and convincing evidence. Tenn. Code Ann. § 29-38-113(a) (2012). Successful plaintiffs may recover economic and non-economic damages, punitive damages, attorney fees, and the costs of the litigation, including expert witness fees. *Id.* § 29-38-106(c).

This case began in 2017 when Jared Effler, District Attorney General for the Eighth Judicial District; Charme Allen, District Attorney General for the Sixth Judicial District; Dave Clark, District Attorney General for the Seventh Judicial District; Russell Johnson, District Attorney General for the Ninth Judicial District; Stephen Crump, District Attorney General for the Tenth Judicial District; Jimmy Dunn, District Attorney General for the Fourth Judicial District; and Mike Taylor, District Attorney General for the Twelfth Judicial District ("the District Attorneys") sued under the Act in their official capacities as

District Attorneys General on behalf of the political subdivisions in their districts.[4] Also joining in the suit were Baby Doe #1 and Baby Doe #2, who alleged they were born in Knox County and Campbell County with neonatal abstinence syndrome[5] because their mothers had taken opioids in Campbell County during pregnancy. The District Attorneys and the Baby Doe plaintiffs sued drug companies Endo Health Solutions Inc., Endo Pharmaceuticals Inc., and Teva Pharmaceuticals USA, Inc. ("the Drug Companies") in the

---

[4] General Effler sued on behalf of Campbell County, City of Jellico, City of LaFollette, Town of Caryville, Town of Jacksboro, Claiborne County, City of Harrogate, Town of Cumberland Gap, Town of New Tazewell, Town of Tazewell, Fentress County, City of Allardt, City of Jamestown, Scott County, Town of Huntsville, Town of Oneida, Town of Winfield, Union County, City of Luttrell, City of Maynardville, and City of Plainview.

General Allen sued on behalf of Knox County and City of Knoxville.

General Clark sued on behalf of Anderson County, City of Clinton, City of Norris, City of Oak Ridge, and City of Rocky Top.

General Johnson sued on behalf of Loudon County, City of Greenback, City of Lenoir City, City of Philadelphia, Town of Farragut, Town of Loudon, Morgan County, City of Harriman, City of Sunbright, City of Wartburg, Town of Oakdale, Town of Oliver Springs, Meigs County, Town of Decatur, Roane County, City of Kingston, and City of Rockwood.

General Crump sued on behalf of Bradley County, City of Cleveland, City of Charleston, Monroe County, City of Madisonville, City of Sweetwater, Town of Tellico Plains, Town of Vonore, McMinn County, City of Athens, City of Etowah, City of Niota, City of Sweetwater, Town of Calhoun, Town of Englewood, Polk County, City of Copperhill, City of Ducktown, and Town of Benton.

General Dunn sued on behalf of Cocke County, City of Newport, Town of Parrottsville, Grainger County, City of Bean Station, Town of Blaine, Town of Rutledge, Jefferson County, City of Baneberry, City of Jefferson City, Town of Dandridge, Town of New Market, Town of White Pine, Sevier County, City of Gatlinburg, City of Pigeon Forge, City of Sevierville, and Town of Pittman Center.

General Taylor sued on behalf of Bledsoe County, City of Pikeville, Franklin County, City of Cowan, City of Decherd, City of Tullahoma, City of Winchester, Town of Estill Springs, Town of Huntland, Grundy County, City of Coalmont, City of Gruetli-Laager, Town of Altamont, Town of Beersheba Springs, Town of Monteagle, Town of Palmer, Town of Tracy City, Marion County, City of New Hope, City of South Pittsburg, City of Whitwell, Town of Jasper, Town of Kimball, Town of Orme, Town of Powells Crossroads, Rhea County, City of Dayton, Town of Graysville, Town of Spring City, Sequatchie County, and City of Dunlap.

[5] Neonatal abstinence syndrome is caused when a baby withdraws from drugs, usually opioids, to which the baby has been exposed in utero. Symptoms of neonatal abstinence syndrome may include tremors, seizures, twitching, excessive crying, poor feeding, slow weight gain, breathing problems, fever, sweating, blotchy skin, trouble sleeping, and digestive issues. The long-term effects of neonatal abstinence syndrome may include developmental delays, behavior and learning issues, problems with speech and language, trouble with sleeping, ear infections and vision problems. *Neonatal Abstinence Syndrome (NAS)*, March of Dimes, https://www.marchofdimes.org/complications/neonatal-abstinence-syndrome-(nas).aspx (last visited Dec. 15, 2020).

Circuit Court for Campbell County.[6] The complaint and its amendments[7] asserted claims under the Act based on the Drug Companies' alleged involvement in fueling addiction to prescription opioid medications, leading to the over-prescribing, over-distribution, and diversion of prescription opioids into the illegal drug market.

The Drug Companies moved to dismiss under Tennessee Rule of Civil Procedure 12.02(6), contending that under the Act, the District Attorneys lacked standing to sue and that the complaint failed to state a statutory claim for relief. The trial court granted the motion to dismiss, finding that the Act did not apply to the Drug Companies because they were legally producing and distributing opioid medications.

The Court of Appeals reversed, holding that the District Attorneys and the Baby Doe plaintiffs had stated a claim under the Act, taking as true the detailed allegations in the complaint about the Drug Companies' knowing participation in the diversion of opioid medications for illegal use. *Effler v. Purdue Pharma L.P.*, No. E2018-01994-COA-R3-CV, 2019 WL 4303050, at *1 (Tenn. Ct. App. Sept. 11, 2019). The Court of Appeals also held that the District Attorneys had standing to sue under the Act. *Id.*

This Court granted the Drug Companies' application for permission to appeal to determine whether under the Act the District Attorneys have standing to sue and whether the complaint states a claim against the Drug Companies on which relief can be granted.

We review the lower court's decision on the Drug Companies' Rule 12.02(6) motion to dismiss on the issues of standing and applicability of the Act de novo with no presumption of correctness. *Nelson v. Myres*, 545 S.W.3d 428, 431 (Tenn. 2018) (quoting *Metro. Gov't of Nashville v. Bd. of Zoning Appeals of Nashville*, 477 S.W.3d 750, 754 (Tenn. 2015)). A motion to dismiss challenges the legal sufficiency of a claim and accepts as true all the complaint's factual allegations. *Id.* at 430. We are required to take the allegations in the complaint as true and give "the plaintiff the benefit of all reasonable inferences." *Webb v. Nashville Area Habitat for Human., Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011) (quoting *Tigg v. Pirelli Tire Corp.*, 232 S.W.3d 28, 31–32 (Tenn. 2007)). When

---

[6] The complaint named additional defendants, including Tennessee Pain Institute, Timothy Gowder, Gary Arlan Moore, and Joshua Hurst, who are not parties to this appeal. Also named in the complaint were Purdue Pharma L.P., Purdue Pharma Inc., The Purdue Frederick Company, Inc., and Mallinckrodt LLC, all of which filed for relief under Chapter 11 of the United States Bankruptcy Code and were granted a stay of litigation. Mallinckrodt LLC filed for bankruptcy relief after oral argument in this case. Mallinckrodt LLC was represented on appeal by Jessalyn H. Zeigler and Sarah B. Miller, Nashville, Tennessee, and Brien T. O'Connor and Andrew J. O'Connor, Boston, Massachusetts.

[7] We review the sufficiency of the third amended complaint filed by the District Attorneys and the Baby Doe plaintiffs.

defendants move to dismiss under Rule 12.02(6), in effect they are admitting the truth of the allegations in the complaint but contending that those allegations do not state a cause of action. *Nelson*, 545 S.W.3d at 430–31 (quoting *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 516 (Tenn. 2005)). "A trial court should grant a motion to dismiss 'only when it appears that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief.'" *Webb*, 346 S.W.3d at 426 (quoting *Crews v. Buckman Lab'ys Int'l, Inc.*, 78 S.W.3d 852, 857 (Tenn. 2002)).

Our review of the lower court's interpretation of the Act is de novo with no presumption of correctness. *State v. Strode*, 232 S.W.3d 1, 9 (Tenn. 2007) (citing *State v. Collins*, 166 S.W.3d 721, 725 (Tenn. 2005)). When construing a statute, it is our role "to ascertain and give effect to the legislative intent" to determine the statutory language's natural and ordinary meaning. *Id.* (quoting *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002)); *id.* (citing *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004)). When construing the language of a statute in terms of its natural and ordinary meaning, we must determine the intent of the Legislature "without a forced or subtle interpretation that would limit or extend the statute's application." *Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn. 2000) (quoting *State v. Blackstock*, 19 S.W.3d 200, 210 (Tenn. 2000)).

## II.

### *Standing of the District Attorneys*

The doctrine of standing ensures that courts hear only those cases that they should— and that only the proper parties bring those claims. When considering the threshold question of standing, we determine "whether a party has a sufficiently personal stake in a matter at issue to warrant a judicial resolution of the dispute." *Metro. Gov't of Nashville*, 477 S.W.3d at 755 (quoting *State v. Harrison*, 270 S.W.3d 21, 28 (Tenn. 2008)). Only a "distinct and palpable injury . . . to a recognized legal right or interest" can support a plaintiff's standing to sue. *Id*. And, crucially, courts must "ascertain whether the *particular plaintiff* is entitled to an adjudication of the particular claims asserted." *Id.* (quoting *Wood v. Metro. Nashville & Davidson Cnty. Gov't*, 196 S.W.3d 152, 158 (Tenn. Ct. App. 2005)) (emphasis added).

The Drug Companies contend that the Act does not name the District Attorneys as parties who can file suit under the Act, and without statutory authorization, the District Attorneys lack standing. The District Attorneys argue that the Act grants them standing under section 106(a) as governmental entities or under section 116(a) as parties with a close alignment of interests with the governmental entities for whom they filed suit.

We begin with the language of the Act which lists the parties who may file suit:

(1) A parent, legal guardian, child, spouse, or sibling of the individual drug user;

(2) An individual who was exposed to an illegal drug in utero;

(3) An employer of the individual drug user;

(4) A medical facility, insurer, governmental entity, employer, or other entity that funds a drug treatment program or employee assistance program for the individual drug user, or that otherwise expended money on behalf of the individual drug user;

or

(5) A person injured as a result of the willful, reckless, or negligent actions of an individual drug user.

Tenn. Code Ann. § 29-38-106(a). In addition, section 116(a) provides that a "prosecuting attorney" may represent the state or a political subdivision that brings a claim under the Act. *Id.* § 29-38-116(a) (2012).

Section 106(a) lists governmental entities, but not District Attorneys, as parties with standing to sue. Presuming that the Legislature means what it says—and does not mean what it does not say—we follow the principle of *expressio unius est exclusio alterius*. This canon of statutory interpretation means that "the expression of one thing implies the exclusion of others." *Rich v. Tenn. Bd. of Med. Exam'rs*, 350 S.W.3d 919, 927 (Tenn. 2011). Relying on this premise, we infer that if the Legislature had intended to enact a certain provision missing from the statute, then the Legislature would have included the provision. Thus, the missing statutory provision is missing for a reason—the Legislature never meant to include it. *See id.* (citing *Amos v. Metro. Gov't of Nashville & Davidson Cnty.*, 259 S.W.3d 705, 715 (Tenn. 2008))*; accord In re Kaliyah S.*, 455 S.W.3d 533, 554 (Tenn. 2015); *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013).

Under this principle, a statute describing the category of parties who can bring a claim under its provisions exhausts that category. This was the basis for the court's ruling in *Tucker v. Dabbs*, 59 Tenn. (12 Heisk.) 18 (1873), where the next friend of a minor tried to submit the minor's claim to arbitration. The *Tucker* court held that the arbitration statute only gave that power to a "party in interest, or . . . an executor, administrator, guardian, trustee, or assignee for creditors." *Id.* at 21 (citing 1858 Code §§ 3432–33 (current version at Tenn. Code Ann. § 29-5-103) (2012)). "It is obvious," the *Tucker* court continued, "that

a next friend does not fall within either of the classes above mentioned" and thus could not submit the minor's claim to arbitration. *Id.* "[W]hen the Legislature has carefully enumerated the persons" who can act on behalf of a claimant, "the strongest implication arises that persons not falling within the category [lack that power]." *Id.* at 21–22. Here, the absence of the District Attorneys from an enumerated list of parties who may bring a claim under the Act shows that the Legislature did not intend for the District Attorneys to have standing to sue under the Act.

The District Attorneys claim to "stand in the shoes" of the political subdivisions in their districts and act as "governmental entities" under the Act. The District Attorneys argue that they wield considerable independence and power as constitutional officers. Elected by the voters within their districts, District Attorneys have the duty to "attend and prosecute according to the law" those cases falling within a judicial district's criminal jurisdiction. Tenn. Const. art. VI § 5; *see also* Tenn. Code Ann. §§ 8-7-101–12 (2012 & Supp. 2020) (laying out the powers, restrictions, and duties of the office). And, a "District Attorney General's discretion to seek a warrant, presentment, information, or indictment within its district is extremely broad and subject only to certain constitutional restraints." *Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207, 209 (Tenn. 1999). All true. Yet the District Attorneys' broad discretion in administering criminal justice does not translate into an entitlement to bring a civil suit not authorized by the Act.

The Legislature knows how to specifically empower District Attorneys to institute a civil action, and it has done so, repeatedly, through express language. The Legislature did not do so here. Legislative authorization may take the form of a freestanding duty, as with the forfeiture of property used to commit a crime. *See* Tenn. Code Ann. § 53-11-452(d)(1)(A) (2012) ("The district attorney general for the judicial district in which the real property lies or the attorney general and reporter shall institute all civil proceedings under this section."). Or a District Attorney General may enjoy the discretion to bring a particular claim, as in the robocall statute. *See* Tenn. Code Ann. § 47-18-1509(a) (2013) ("The district attorney general of the county in which or from which automated calls in violation of this part are made may seek injunctive relief to enforce this part and recover such statutory damages and attorney's fees as are set out in § 47-18-1510."). Or a District Attorney General may act at the behest of some other state official like the Finance Commissioner. *See* Tenn. Code Ann. § 45-1-123(a) (2020) ("The district attorneys general in each county, when requested by the commissioner, shall, as a part of their official duty and without compensation, represent the commissioner in any suit that the commissioner may desire to bring . . . in their respective counties."). There are many other examples,

including those cited by the District Attorneys, all of which contain or require express authorization to sue.[8]

The District Attorneys hang their hat on section 116(a) which allows a prosecuting attorney to "*represent* the state or a political subdivision of the state" in a suit under the Act. Tenn. Code Ann. § 29-38-116(a) (emphasis added). The District Attorneys argue that "representation" has multiple meanings, including when a lawyer represents a client, but also when a party has "such a close alignment of interests with another person" that the party is considered "having been present in the litigation," as in a class action lawsuit. *Representation*, Black's Law Dictionary (11th ed. 2019). We agree that "representation" can have many meanings ranging from a presentation of fact, a lawyer representing a client, a party with a close alignment of interests with other persons in a class action suit, and the assumption of an heir to the rights of a predecessor. *See id*. We construe the language of the Act according to its plain and ordinary meaning without a forced interpretation that would limit or extend the Act's application. *Coleman v. Olson*, 551 S.W.3d 686, 694 (Tenn. 2018); *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000). Here, based on the wording of the Act, we conclude that the Legislature did not intend to use the term "representation" as it is used in class action lawsuits. Instead, we determine that the Legislature meant that a prosecuting attorney could serve as legal counsel for a party who has statutory standing to sue. If the Legislature had intended to authorize District Attorneys to sue in their own

---

[8] *See* Tenn. Code Ann. § 63-6-226(b) (2012) ("It is the duty of the attorney general . . . or of the district attorney general of any county in which service of process may be had upon the person liable, to institute in the name of the state all suits necessary for the recovery of the sum of money."); Tenn. Code Ann. § 43-6-106(12) (2007) ("It is the duty of the commissioner to protect the agricultural, silvicultural and horticultural or other interests of the state from insect pests, pest plants, or plant diseases and to that end the commissioner is vested with power and authority to [a]pply to courts of competent jurisdiction for writs of injunction and institute criminal proceedings for the enforcement of this part. It is the duty of the several district attorneys general to represent the commissioner when called upon to do so."); Tenn. Code Ann. § 29-35-109 (2012) ("The suit is brought by the attorney general for the district or county, when directed so to do by the general assembly, or by the governor and attorney general of the state concurring."); Tenn. Code Ann. § 55-13-105(a) (2020) ("The chancery courts have jurisdiction to grant injunctions restraining violations of this chapter upon proceedings brought by the attorney general . . . , the district attorney general or any party in interest."); Tenn. Code Ann. § 29-3-102 (2012 & Supp. 2020) ("The jurisdiction is hereby conferred upon the chancery, circuit, and criminal courts . . . to abate the public nuisances defined in § 29-3-101, upon petition in the name of the state, upon relation of the attorney general and reporter, or any district attorney general, or any city or county attorney, or without the concurrence of any such officers, upon the relation of ten (10) or more citizens and freeholders of the county wherein such nuisances may exist . . . ."); Tenn. Code Ann. § 8-47-102 (2016) ("The attorney general . . . has the power . . . to institute proceedings in ouster against any and all state, county, and municipal officers, under the provisions of this chapter, and the district attorneys general, county attorneys, and city attorneys, within their respective jurisdictions, may institute such actions, without complaint being made to them or request made of them, as they are authorized to institute upon request made of them or complaint made to them.").

names or represent a class of plaintiffs, the Legislature could have expressly done so. We see no reason to depart from the tenets of statutory interpretation when a more plausible interpretation is readily available: that section 116(a) permits a governmental entity to authorize its District Attorney to serve as its counsel under the Act. And here the District Attorneys are not serving as counsel for any governmental entities, but as plaintiffs with retained counsel. There is no allegation that the District Attorneys provided notice to the governmental entities about this action or gained authorization to sue on their behalf. The District Attorneys' other analogies—to a "candidate's representative" suing over a defective ballot, representation of minors and others who lack the legal capacity to sue, and representation by fiduciaries or agents subject to a principal's direction and control—do not apply here.

The flaw in the District Attorneys' position is apparent in a direct application of their theory to the text of the statute. The idea that any one of Tennessee's thirty-one locally elected District Attorneys General could litigate and bind the entire state to that judgment under the Act buckles under its own contradictions.[9] The only viable reading of section 116 requires the relevant government entity to authorize representation by a local District Attorney.

The District Attorneys also argue that we must give effect to the remedial purposes of the Act. But where the plain text of a statute is clear, we need look no further. *State v. Gibson*, 506 S.W.3d 450, 455–56 (Tenn. 2016). And the District Attorneys' theories will not conjure up ambiguity where there is none to be found. The Act, unmistakably, does not create a cause of action for local prosecutors to sue in their own names. And even if we were to look to the Act's remedial purposes, that consideration is not enough for us to read a cause of action into the statute contrary to established principles of interpretation.

We consider statutory language ambiguous when it can be interpreted in different ways that produce contrary results. *Wallace v. Metro. Gov't of Nashville & Davidson Cnty.*, 546 S.W.3d 47, 53 (Tenn. 2018) (citing *In re Hogue*, 286 S.W.3d 890, 894 (Tenn. 2009)). But "[t]his proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of the statute," especially if one of those interpretations is "nonsensical or clearly erroneous." *Id.* (quoting *Powers v. State*, 343 S.W.3d 36, 50 n.20 (Tenn. 2011)). We find that the District Attorneys' interpretation of the Act is clearly erroneous and thus does not create an ambiguity. We need to go no further than the plain language of the Act to conclude that the District Attorneys lack standing to bring this claim.

---

[9] As the State points out in its amicus curiae brief, the position taken by the District Attorneys "could jeopardize the litigation brought by the Attorney General [against opioid drug companies on behalf of the State] by putting the cases initiated by the Attorney General and the district attorneys at loggerheads with each other."

***The Act's Application to the Drug Companies***

Next, we turn to the Baby Doe plaintiffs' claims against the Drug Companies. The Baby Doe plaintiffs argue that the Act applies to the Drug Companies because they intentionally participated in the illegal drug market. The Act provides that "a person who knowingly participates in the illegal drug market within this state is liable for civil damages." Tenn. Code Ann. § 29-38-105(a). The definition of "person" under the Act includes corporate entities. *Id.* § 29-38-104(11) (2012). Participation in the illegal drug market "means to distribute, possess with an intent to distribute, commit an act intended to facilitate the marketing or distribution of, or agree to distribute, possess with an intent to distribute, or commit an act intended to facilitate the marketing or distribution of an illegal drug." *Id.* § 29-38-104(9). The Act defines "illegal drug market" as "the support system of illegal drug related operations, from production to retail sales, through which an illegal drug reaches the user." *Id.* § 29-38-104(2). An illegal drug is *any* drug "the distribution of which is a violation of state law." *Id.* § 29-38-104(1). Distribution of opioids, which are Schedule II controlled substances, to a person without a valid prescription violates state law. *See* Tenn. Code Ann. § 39-17-402 (2018 & Supp. 2020); *id.* § 39-17-408(b)(1) (2018); *id.* § 39-17-417(a)(2)–(3) (2019 & Supp. 2020).[10] Thus, the plain meaning of the language of the Act suggests that it applies to a corporation that knowingly distributes or commits an act intended to facilitate the production, marketing, distribution or sale of opioids to a person who does not have a valid prescription.

To establish a defendant's involvement, a plaintiff may rely on a "market liability" theory by establishing that:

> (A) The place of illegal drug activity by the individual drug user is within the illegal drug market target community[11] of the defendant;

---

[10] "It is an offense for a defendant to knowingly . . . (2) [d]eliver a controlled substance; [or] (3) [s]ell a controlled substance . . . ." Tenn. Code Ann. § 39-17-417(a)(2)–(3). "'Controlled substance' means a drug, substance, or immediate precursor in Schedules I through VII of §§ 39-17-403–39-17-416[.]" *Id.* § 39-17-402(4). Opioids are Schedule II drugs, as are cocaine, amphetamines, and methamphetamines. *Id.* § 39-17-408(b)(1), (4); *id.* § 39-17-408(c). Under Tennessee law, Schedule II drugs may be dispensed only with an electronic or written prescription from a health care provider. Tenn. Code Ann. § 53-11-308(a).

[11] The "illegal drug market target community" depends on the level of the drug offense that the person's conduct would constitute under section 29-38-109. *See* Tenn. Code Ann. § 29-38-104(3). The offenses range from Level 1, with a target community of "the state house of representatives legislative district" to Level 4, having the entire state as its target community. *Id.* § 29-38-109 (2012). The Baby Doe plaintiffs allege that the Drug Companies distributed millions of opioids throughout seven judicial districts encompassing twenty-three Tennessee counties. Those counties include Knox and Campbell Counties where the Baby Doe plaintiffs allege they were exposed to opioids and born with neonatal abstinence

(B) The defendant's participation in the illegal drug market was connected with the same type of illegal drug used by the individual drug user; and

(C) The defendant participated in the illegal drug market at any time during the individual drug user's period of illegal drug use.

Tenn. Code Ann. § 29-38-106(b)(2).

The Drug Companies allegedly manufactured and distributed highly addictive opioids in quantities too large to be medically justified. For example, the Baby Doe plaintiffs allege that in 2016 there were 1.148 opioid prescriptions per person in Tennessee. In 2015, Tennessee had the second highest number of filled opioid prescriptions in the nation, with 1.18 prescriptions—fifty-one hydrocodone pills and twenty-one oxycodone pills—for every man, woman, and child in the state. The Baby Doe plaintiffs also allege that from 2012 to 2016, opioid overdose deaths in Tennessee reached a record high—1,186 in 2016 alone—the equivalent of three overdose deaths every day. According to the complaint, from 2005 to 2015, overdose deaths in Tennessee increased by more than 250%, accounting for more deaths than car wrecks, suicides, or homicides.

The Baby Doe plaintiffs' 146-page complaint states many specific and detailed allegations of intentional conduct by the Drug Companies to fuel the demand in the illegal market for their opioid medications and to flood the market with an over-supply of opioids to meet that demand. The complaint alleges that the Drug Companies observed signs of illegal diversion, and they knew that some of the opioids were being distributed without a prescription and thus were illegal drugs. The Baby Doe plaintiffs assert that the Drug Companies knew and intended that unscrupulous doctors, "pill mills," or others on the street would distribute the drugs to persons not registered to receive them.[12] This conduct would occur *during* and as part of the diversion of the drugs to the illegal market. Some of the Baby Doe plaintiffs' allegations state:

---

syndrome. This alleged conduct and the quantity of opioids involved make this a Level 4 offense under section 109 so that the "illegal drug market target community" is the entire state. *Id.* § 29-38-109(4).

[12] The International Association of Defense Counsel contends in its amicus curiae brief that the decision of the Court of Appeals in this case "finds no support in any other jurisdiction and no support among any of the commentators who have analyzed the [Drug Dealer Liability Act] in the last 27 years." This case, however, may be distinguished by the specific and detailed allegations of the Drug Companies' knowing and purposeful participation in the illegal drug market as stated in the Baby Doe plaintiffs' complaint.

- The Drug Companies "spent years pushing their wares into a market of unsuspecting doctors and patients, and they continue to knowingly participate in and profit from the illegal opioid market that they helped create."

- The Drug Companies know opioids are "over-prescribed in Tennessee . . . at levels far beyond what could be medically justified; that a legion of addicts are obtaining pills on the black market or through 'pill mills' [;] . . . that a significant share of the opioids market in Tennessee and East Tennessee consists of illegal drug transactions; and that they are reaping profits from drug sales destined for this illegal drug market."

- Even though they knew of the "substantial risks of addiction, abuse, and illegal diversion associated with prescribing opioids for chronic pain," the Drug Companies "each played a key role in creating, perpetuating, and/or expanding the opioid crisis, including the creation of a legion of addicts who would seek pills on the black market or through 'pill mills.'"

- The Drug Companies knew that "an expanding opioids market would (a) create a legion of addicts dependent on opioids; (b) encourage the medically unnecessary prescription of opioids and the abuse of opioids; and (c) foster a secondary illegal drug market premised on the illegal diversion of opioids. Nevertheless, they made every effort to expand that market, to keep the flow of opioids streaming into communities at levels that were not medically justifiable and enjoy profits derived from the illegal distribution of opioids."

- The Drug Companies' "promotion of opioids gave rise to and fueled the illegal drug market that existed in the Opioid Epidemic Affected Counties[13] during all periods relevant to this suit. Each company's representations regarding the risks of opioids and actions taken to push opioids through aggressive marketing of their collective message contributed to the market for both illegally prescribed opioids and for diverted opioids (and heroin for those addicts who could no longer obtain or afford prescription opioids)."

- "The dramatic rise in opioid prescriptions, and associated overdoses, other related health problems, and [neonatal abstinence syndrome] births . . . since the commencement of [the Drug Companies'] campaign in the mid-1990's shows

---

[13] The third amended complaint defines counties, cities, and towns of the Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, and Twelfth Judicial Districts as "Opioid Epidemic Affected Counties." Knox County is in the Sixth Judicial District; Campbell County is in the Eighth Judicial District.

the scope of the illegal drug market knowingly created by [the Drug Companies]."

- "[The Drug Companies] have knowingly continued to distribute opioids in amounts that they know are not medically justified, that they know are continuing to create opioid addicts, that they know are being illegally prescribed and/or illegally diverted, and . . . they know they are profiting from . . ."

- The high "rates of [neonatal abstinence syndrome] in East Tennessee are a natural consequence of, and are proximately caused by, the illegal drug market in which [the Drug Companies] participate. [The Drug Companies] knew that their acts and omissions with regard[] to the marketing and distribution of opioids would result in a community of addicts, that those addicts would likely seek opioids through illegal distribution channels, and that many of those addicts would give (and have given) birth to babies dependent upon opioids with alarming frequency in East Tennessee and elsewhere as a result of those addicted mothers' ingestion of opioids during pregnancy."

- "Endo also continues to participate in an illegal drug market that it helped create."

- "Despite evidence of widespread abuse, Endo continued to push its drug into the addiction pipeline in Tennessee, including the Opioid Epidemic Affected Counties, with its highly addictive, and deadly, prescription opioid, all the while knowing that it was being diverted into the illicit market."

- Endo was aware of the excessive volume of opioid prescriptions in Tennessee and "knew that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids, including Endo's products. On information and belief, Endo also knowingly participated in the illegal drug market in the Opioid Epidemic Affected Counties by supplying quantities of its products to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion."

- "Teva continues to flood East Tennessee with opioids in an amount that clearly contributes to the illegal opioid drug market," having the largest market share of generic oxycodone and hydrocodone throughout Tennessee, which "clearly exceed[s] the number that would be appropriate for normally prescribed therapeutic use and contribute[s] to the illegal East Tennessee opioid market."

- "On information and belief, Teva also knowingly participated in the illegal drug market in Tennessee by supplying suspicious quantities of its products to suspect physicians and pharmacies in Tennessee, without disclosing suspicious orders as required by applicable regulations."

- "[U]pon information and belief, through their market research and extensive networks of sales representatives and face-to-face detailing of health care providers . . ., [the Drug Companies] could, and did, observe signs of illegal diversion."

- "Upon information and belief, [the Drug Companies] also received information from credible sources—including, but not limited to, pharmacists and law enforcement agencies—that [a health care provider] or his or her patients were diverting prescription medication."

- "[The Drug Companies] failed to cut off these [health care providers'] prescription opioid supply at the pharmacy level—meaning the pharmaceutical drug producers continued to generate sales revenue from their prescriptions— and failed to report the unscrupulous providers to state medical boards and state and federal law enforcement agencies."

- "By failing to report and/or prevent suspicious orders, [the Drug Companies] enabled the supply of prescription opioids to obviously suspicious physicians and pharmacies, enabled the illegal diversion of prescription opioids, aided criminal activity and disseminated massive quantities of prescription opioids into the black market."

- "Under Tennessee criminal laws, . . . oxycodone, Roxicodone, OxyContin, Opana, Lortab and other opioids are illegal drugs if possessed, sold, and distributed without a valid prescription."

- "Under clearly established Tennessee law, illegally diverted opioids are 'illegal drugs.'"

- The Drug Companies "knowingly failed to implement effective controls and procedures in their supply chains to guard against theft, diversion, and abuse of prescription opioids, and failed to adequately design and operate a system to detect, halt, and report suspicious orders of prescription opioids."

- "As a result, [the Drug Companies] knowingly disseminated massive quantities of prescription opioids to suspect physicians and pharmacies and into the black market, including 'pill mills' . . . ."

- The Drug Companies "knowingly participated in the production and/or distribution of prescription opioids that reached [the Baby Doe plaintiffs] and the Opioid Epidemic Affected Counties during all times relevant to this complaint."

- Baby Doe #1 was born with neonatal abstinence syndrome in Knox County. His mother was raised and began using opioids in Campbell County.

- Baby Doe #2 was born with neonatal abstinence syndrome in Campbell County. His mother used opioids purchased in Campbell County throughout her pregnancy.

- The Baby Doe Plaintiffs' neonatal abstinence syndrome was caused by the illegal drug market in which the Drug Companies knowingly participated.

These allegations, taken as true, could prove that the Drug Companies knowingly flooded communities in East Tennessee with highly addictive opioids they knew would be sold in the illegal drug market. We agree with the Court of Appeals that the Drug Companies cannot "knowingly seek out suspect doctors and pharmacies, oversupply them with opioids for the purpose of diversion, benefit from the process, and then cynically invoke their status as otherwise lawful companies to avoid civil liability." *Effler*, 2019 WL 4303050, at *10. If the Baby Doe plaintiffs prove their allegations at trial, a jury could reasonably conclude that the Drug Companies knowingly participated in the illegal drug market. The Act's broad definition of "participation in the illegal drug market" includes the distribution and facilitation of the marketing or distribution of an illegal drug. Tenn. Code Ann. § 29-38-104(9).[14]

There are no reported decisions with similar allegations brought under the Model Drug Dealer Liability Act in other states. The Drug Companies cite three cases to support their position that the Act does not apply, but all are distinguishable. In *Whittemore v. Owens Healthcare-Retail Pharmacy, Inc.*, 111 Cal. Rptr. 3d 227 (Cal. Ct. App. 2010), the issue was whether a pharmacy could be held liable under the California Drug Dealer Act,

_____

[14] In assessing whether the allegations of the Baby Doe plaintiffs' complaint state a claim for relief, we focus on the broad language the legislature actually used in the statute, which does not exempt distributors of prescription drugs who have allegedly engaged in activities that amount to participation in the illegal drug market.

Cal. Health & Safety Code §§ 11700–11717, for the conduct of an employee who furnished the plaintiff with stolen prescription drugs. Ms. Whittemore bought black market pain medications, including OxyContin, from an employee of the defendant pharmacies. 111 Cal. Rptr. 3d at 229. Ms. Whittemore and her husband later sued the pharmacies where the employee worked and obtained the drugs, claiming that the pharmacies had failed to monitor and account for controlled substances as required by federal law. *Id.* at 229–30. After the trial court dismissed the case based on unclean hands, the plaintiffs sought to amend their complaint to assert that California's Drug Dealer Liability Act creates a statutory exception to the doctrine of unclean hands. *Id.* at 231. The California Court of Appeals affirmed the trial court's dismissal of the claims, holding that the plaintiffs could not state a claim under the California Act because they could not show—and did not allege—that the pharmacies "knowingly" participated in marketing the drugs to Ms. Whittemore. *Id.* at 231–32. Here, the Baby Doe plaintiffs allege the Drug Companies knowingly participated in marketing and distributing opioids in the illegal drug market. There is no allegation that an employee of the Drug Companies sold the drugs "out the back door" without their knowledge.

In another case involving a pharmacy, *Schafer v. Shopko Stores, Inc.*, 741 N.W.2d 758 (S.D. 2007), the issue was whether a pharmacy that dispensed a validly prescribed drug (morphine sulfate) to an authorized agent could be held liable under the South Dakota Drug Dealer Liability Act, S.D. Codified Laws §§ 34-20C-1 to -19. The person for whom the morphine was prescribed sent an agent to pick up the drug at the pharmacy. The agent later died after consuming some of the morphine along with a potentially toxic dose of Xanax that did not come from the pharmacy. 741 N.W.2d at 760. The guardian ad litem filed suit, claiming that the pharmacy participated in the illegal drug market by dispensing the morphine to someone other than the person with the prescription or a member of her household. *Id.* The South Dakota Supreme Court rejected that argument, noting that South Dakota law does not require a pharmacist to only dispense a controlled drug to the "ultimate user" and not the user's agent. *Id.* at 762 (citing S.D. Codified Laws § 36-11-2(7)). Thus, the pharmacy did not act illegally in filling a valid prescription and delivering it to an authorized agent. For that reason, the pharmacy's legal action did not fall within the scope of the Drug Dealer Liability Act. *Id.* at 762–63.

Here, unlike in *Whittemore* and *Schafer*, the Baby Doe plaintiffs have made factual allegations that the Drug Companies knowingly and purposefully participated in the illegal drug market by deceptively and aggressively marketing their opioid medications, encouraging doctors to prescribe and even over-prescribe opioids, and over-supplying opioids for distribution in East Tennessee and specifically in the counties where the Baby Doe plaintiffs were exposed to the drugs. The legal conduct of the pharmacies in

- 18 -

*Whittemore* and *Schafer* differs from the intentional misconduct alleged against the Drug Companies here.

The Drug Companies also cite *Cooper v. Purdue Frederick Co.,* No. 08-3757, 2008 WL 11355004 (E.D. La. Nov. 5, 2008). But this case is of no help to the Drug Companies. The plaintiffs, a husband and wife, sued three drug companies and a pharmacy under the Louisiana Drug Dealer Liability Act, La. Stat. Ann. §§ 9:2800.61–76, after the husband was prescribed and became addicted to OxyContin, which caused suicidal thoughts, overdoses, and withdrawal symptoms. 2008 WL 11355004, at *3. The United States District Court for the Eastern District of Louisiana granted a motion to dismiss because the suit was barred by the applicable one-year prescriptive period and the plaintiffs failed to timely oppose the motion. *Id.* at *1. The plaintiffs filed a motion to alter or amend under Federal Rule of Civil Procedure 59. *Id.* The district court denied the motion based on the plaintiffs' failure to show good reason for the court to reconsider its judgment. *Id.* at *2. The district court, in dicta and with no analysis, stated that the Act established "'a cause of action against drug dealers,' not pharmaceutical companies." *Id.* at *3 (quoting La. Stat. Ann. § 9:2880.61B). The district court explained that OxyContin may be legally dispensed with a prescription, and thus the plaintiffs failed to prove that the Act applied. *Id. Cooper* involved a single user who had been prescribed OxyContin and alleged that the manufacturer had misrepresented the risk of addiction and other side effects. The plaintiffs' suit was dismissed not on the merits but because it was not timely filed.

We find persuasive the rationale of the United States District Court for the Southern District of Ohio that when a community is flooded with highly-addictive drugs, a black market for those drugs will follow. *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2018 WL 6628898, at *19 (S.D. Ohio Dec. 19, 2018). In refusing to dismiss negligence claims against distributors and manufacturers of opioid medications, the court said:

> Here, taking Plaintiffs' allegations as true, by failing to administer responsible distribution practices . . ., Defendants not only failed to prevent diversion, but affirmatively created an illegal, secondary opioid market. Opioids are Schedule II drugs. Despite Manufacturer Defendants' marketing campaign to the contrary[,] it is well known that opioids are highly addictive. When there is a flood of highly addictive drugs into a community it is foreseeable—to the point of being a foregone conclusion—that there will be a secondary, "black" market created for those drugs.

*Id.* Defining the intentional over-supplying of addictive medications as illegal distribution is not a new concept. The United States Supreme Court recognized over seventy-five years

ago that when a drug manufacturer sold morphine sulfate to a small-town doctor "in such quantities, so frequently and over so long a period[,] it must have known he could not dispense the amounts received in lawful practice and was therefore distributing the drug illegally." *Direct Sales Co. v. United States*, 319 U.S. 703, 705 (1943).

The Drug Companies argue they are not "drug dealers" as referenced in the caption and the opening section of the Act—"This chapter shall be known and may be cited as the 'Drug Dealer Liability Act.'" Tenn. Code Ann. § 29-38-101 (2012). Asserting that courts may consider the caption of a statute when interpreting the statute, the Drug Companies point to the various dictionary definitions of "drug dealer": "an unlicensed dealer in illegal drugs," "a person who sells illegal drugs," or a person who "makes money selling illegal recreational drugs." But those definitions are beside the point. Here, the plain language of the Act clearly and unambiguously defines "illegal drug" and "illegal drug market." When the statutory language is clear, we do not consider a statute's caption. *See Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 421 (Tenn. 2013).

The Drug Companies also assert that the Act's imposition of "market liability" on those who participate in the illegal drug market should not apply to the legal drug market for Federal Drug Administration-approved prescription medications. Yet, the Act explains that, under the market liability theory, some states have provided in case law "for civil recovery by plaintiffs who are unable to identify the particular manufacturer of the product that is claimed to have caused them harm, allowing recovery from all manufacturers of the product who participated in that particular market." Tenn. Code Ann. § 29-38-103(9). The Act acknowledges that market liability has the "potential for undermining" legitimate markets because it may be "destructive of market initiative and product development." *Id.* But the Act then explains that this is precisely why the Act has adopted "a legislatively crafted form of liability *for those who intentionally join the illegal drug market*." *Id.* (emphasis added). The illegal drug market is not a legitimate market that merits protection from market liability. The Drug Companies insist that they only participate in the legal drug market, but, as the Court of Appeals aptly observed, that merely begs the question. *Effler*, 2019 WL 4303050, at *10. That the "distribution system for prescription opioid medications is legal and . . . extensively regulated" is immaterial if the Drug Companies' marketing and distribution practices as alleged in the complaint amounted to participation in the illegal drug market as defined in the Act. If the Baby Doe plaintiffs can prove that the Drug Companies intentionally participated in the illegal drug market, separate and distinct from their participation in the legal drug market, then the Act's legislatively created form of market liability applies to that conduct.

Amici curiae in support of the Drug Companies argue that drug companies have no way to know what happens to the opioid medications when they leave the companies'

control after being sold "in a highly regulated distribution chain." They argue that the Act only applies "to those who deal drugs *during or after* . . . diversion to the illegal drug market." The International Association of Defense Counsel similarly asserts that drug companies' sales to licensed distributors do not become "illegal" "even if criminal third parties might *later* distribute opioids in violation of state law." We disagree. The Drug Companies admit that if they "knowingly distribute[d] medications to a person not registered to receive them . . . that could constitute the distribution of 'illegal drugs' under the [Act]." Here, if the Baby Doe plaintiffs' allegations are proven at trial, the jury could reasonably conclude that the Drug Companies' actions constitute the distribution of illegal drugs under the Act.

Along these lines, the Baby Doe plaintiffs allege that the Drug Companies' intentional conduct has fueled both opioid addiction and the illegal black market for opioid drugs; that the Drug Companies purposefully directed their conduct at the counties where the Baby Doe plaintiffs were exposed to opioids in utero; and that the Baby Doe plaintiffs suffered from neonatal abstinence syndrome because of the Drug Companies' actions. These allegations, taken as true, amount to participation in the illegal drug market as defined by the Act.

Finally, the Drug Companies urge this Court to rule that the Act does not apply in this case in order to "avoid the serious constitutional question whether the Act's 'market liability' scheme violates due process." The Drug Companies have not asked the Court to rule on the constitutionality of the Act, so that issue is not before us. Rather, the Drug Companies have asked the Court to determine whether section 105(a) of the Act, which provides for liability against those who knowingly participate in the illegal drug market, "encompass[es] a pharmaceutical company's lawful sale of prescription medications to legal, state-licensed distributors because a portion of those medications are ultimately diverted into illegal drug markets by the illegal acts of third parties." We have done so by determining that section 105(a) encompasses the conduct of the Drug Companies as alleged in the complaint.

The Baby Doe plaintiffs have the burden of proving to a jury by clear and convincing evidence that the Drug Companies participated in the illegal drug market. Tenn. Code Ann. § 29-38-113(a). But at this early stage of the case, our standard of review requires us to accept as true the allegations of the Baby Doe plaintiffs. *See Nelson*, 545 S.W.3d at 430. Applying this standard, we hold that the Baby Doe plaintiffs have stated a claim against the Drug Companies for which relief may be granted under the Act.

**CONCLUSION**

We hold that the District Attorneys lack standing to bring an action under the Act as individual plaintiffs. We also hold that the Baby Doe plaintiffs, whose standing is not in dispute, have stated a claim against the Drug Companies based on the allegations of intentional and purposeful participation in the illegal opioid market. Thus, we reverse the judgment of the Campbell County Circuit Court, reverse in part and affirm in part the judgment of the Court of Appeals, and remand to the Campbell County Circuit Court for further proceedings consistent with this opinion. The costs of this appeal are taxed one-half to Jared Effler, District Attorney General–Eighth Judicial District; Charme Allen, District Attorney General–Sixth Judicial District; Dave Clark, District Attorney General–Seventh Judicial District; Russell Johnson, District Attorney General–Ninth Judicial District; Stephen Crump, District Attorney General–Tenth Judicial District; Jimmy Dunn, District Attorney General–Fourth Judicial District; Mike Taylor, District Attorney General–Twelfth Judicial District and one-half to Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; and Teva Pharmaceuticals USA, Inc., for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE